Lori HOFFLANDER, Plaintiff-Appellant,††

MILWAUKEE COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff-Co-Appellant,

v.

ST. CATHERINE'S HOSPITAL, INC., Sentry Insurance, a Mutual Company, Patients Compensation Fund, Horizon Mental Health Management, Inc. and Columbia Casualty Company, Defendants-Respondents.†

Court of Appeals

*No. 00–2467. Submitted on briefs June 6, 2001.—Decided August 8, 2001.*

2001 WI App 204

(Also reported in 635 N.W.2d 13.)

† Petition to review granted 11-27-01.
†† Petition for cross-review granted 11-27-01.

639

On behalf of the plaintiff-appellant Lori Hofflander, the cause was submitted on the briefs of *Jerome A. Hierseman* of *Gray & End, L.L.P.* of Milwaukee.

On behalf of the plaintiff-co-appellant Milwaukee County Department of Human Services, the cause was submitted on the brief of *Louis Edward Elder*, principal assistant corporation counsel.

On behalf of the defendants-respondents St. Catherine's Hospital, Inc., Sentry Insurance, and Patients Compensation Fund, the cause was submitted on the briefs of *John A. Nelson* and *Timothy W. Feeley* of *von Briesen, Purtell & Roper, S.C.* of Milwaukee.

On behalf of the defendants-respondents Horizon Mental Health Management, Inc., and Columbia Casualty Company, the cause was submitted on the briefs of *John K. Hughes* of *Gessler, Hughes & Socol, Ltd.* of Chicago, Illinios.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. Lori Hofflander brought negligence and safe place claims against St. Catherine's Hospital, Inc. and its insurer, Sentry Insurance (St. Catherine's) for injuries she sustained when she fell from a third-floor window of a locked psychiatric unit. The other defendants in this case are Horizon Mental Health Management, Inc. and its insurer, Columbia Casualty Company (Horizon). The trial court granted summary judgment in favor of St. Catherine's and Horizon, ruling that the "custody and control" rule enunciated in *Jankee v. Clark County*, 2000 WI 64, 235 Wis. 2d 700, 612 N.W.2d 297, did not apply to Hofflander because the health care providers could not have foreseen the particular manner in which she injured herself. The trial court then found that Hofflander's negligence exceeded the negligence of the health care providers as a matter of law. We determine, however, that the *Jankee* foreseeability prong requires only that the risk of elopement be foreseeable, not the manner of the elopement. Moreover, our independent review of the record reveals that the facts and the reasonable inferences to be drawn from them regarding the foreseeability of Hofflander's elopement are in dispute and therefore summary judgment is not appropriate. We further determine that there are disputed material facts regarding whether an unsafe condition existed in the hospital at the time these events commenced, rendering this issue also inappropriate for summary judgment.

¶ 2. Hofflander also challenges a pretrial order barring discovery of certain hospital records. We affirm the trial court's determination that the records are privileged peer review documents under WIS. STAT. § 146.38 (1999–2000).[1]

### *Facts*

¶ 3. On December 28, 1996, City of Kenosha police responded to a call regarding a suicidal person. Family and friends identified the person as Hofflander and informed the officers of their concern for her safety. Hofflander's friend, Pam Stewart, indicated that Hofflander had threatened to kill herself by taking an overdose of Valium, that she had been distraught over losing custody of her children and her drunk driving convictions, and that she desperately needed help. Hofflander's former husband indicated that Hofflander had called him threatening to kill herself in one hour. The police observed that Hofflander was uncooperative and had erratic mood swings. The officers took Hofflander into custody and transported her to St. Catherine's, where she was involuntarily admitted pursuant to WIS. STAT. ch. 51.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

Milwaukee County Department of Human Services is a party in this case as a subrogee to Hofflander. The trial court's judgments in favor of St. Catherine's and Horizon included the taxation of costs against Milwaukee County. Milwaukee County filed a motion in opposition to the taxation of costs. After a hearing, the trial court issued an order denying the motion and Milwaukee County now appeals that order. Because we are reversing the underlying causes of action, Milwaukee County is reinstated as a plaintiff-subrogee and we do not address the merits of its claim on appeal.

¶ 4. Dr. Ligay Ilagan-Newman completed a history and physical examination report the next day. Ilagan-Newman's impression included dysthymia[2] and borderline personality disorder. She noted that "suicide precaution initially ordered, now discontinued." She further noted that "[t]he patient at this time is anxious to leave the facility because she wants to relocate herself into a smaller apartment for financial reasons."

¶ 5. Hofflander was placed in room 307 on the third floor of St. Catherine's psychiatric unit. St. Catherine's contracts with Horizon to manage that unit. In other words, Horizon managers supervise St. Catherine's staff and develop and implement policies and procedures pertaining to the unit. Some of the safety policies included patient rounds on an hourly basis during the day and every half hour at night, special suicide and elopement precautions, and an environmental round on every shift to check for unsafe conditions. Windows were fitted with Lexon coverings to prevent patient access, and air conditioning units were affixed with safety screws.

¶ 6. During the course of Hofflander's two-day admission to St. Catherine's, she exhibited volatile and uncooperative behavior. Examples of this behavior are reflected in nurses' notes contained in the medical record and will be discussed in more detail later in this opinion. The parties do not dispute that at some point during Hofflander's stay at St. Catherine's, she made a decision to escape. Because of the relevant nature of these events, we will now describe in detail the circumstances just prior to Hofflander's attempted elopement.

---

[2] "Dysthymia" is "morbid anxiety and depression accompanied by obsession." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 712 (1993).

¶ 7. At approximately 5:15 p.m. on December 30, 1996, Dr. Ashok Shah interviewed Hofflander. Shah found her to be alert with labile affect, irritable and sarcastic. She denied having drug and alcohol problems despite a positive drug screening. Shah did not believe she had suicidal ideation. The interview ended at about 5:45 p.m., at which time he entered a note of his plan to decrease her Valium, continue Prozac and allow Hofflander to sign for voluntary outpatient treatment once stable. Shah then asked nurse Cathy Witheril to check on Hofflander because she was irritable.

¶ 8. At Shah's request, Witheril went to Hofflander's room and discovered her putting on her high-top black shoes with laces she had made by tearing strips from a bed sheet.[3] Witheril removed the shoes and laces, observing that otherwise Hofflander's room looked undisturbed. Five minutes later, Hofflander appeared at the nurses' station asking for her make-up. Shah directed the nurses not to give Hofflander any glass objects and the make-up was dispensed into a medicine cup. The nurses observed Hofflander taking phone numbers from her purse and going to the telephone lounge.

¶ 9. According to Hofflander, she had telephoned Stewart to bring her car to the hospital because she was planning to escape. She then went to room 309 because a patient, not the occupant of that room, had told her there was a loose air conditioning unit in the window. She pulled the air conditioner toward her and it crashed to the floor. Hofflander testified that at that point she panicked, thinking she might get caught, so she peeked out the door to see if anyone was coming. She saw no

---

[3] According to hospital policy, patients were not allowed to possess rope or cords.

one. She then tied some bed sheets together, affixing one end to the corner of the window. As she attempted to exit the window and climb down, she lost her grip and fell from the third-story window. Apparently, Hofflander attempted to elope within fifteen to twenty minutes of her conversation with Shah.[4] Nurses who found her testified that she had a bed sheet tied around her ankle. She suffered multiple injuries, including a ruptured spleen and fractures to her ribs, pelvis and arm.

¶ 10. Hofflander filed suit against St. Catherine's and Horizon, alleging negligence and safe place violations. Following discovery, St. Catherine's and Horizon filed motions for summary judgment asserting that Hofflander's negligence precluded her from recovery as a matter of law and that the safe place statute was inapplicable in this case. Initially, the trial court granted Horizon's motion on the safe place issue only. After the supreme court issued its ruling in *Jankee*, Horizon and St. Catherine's renewed their motions for summary judgment. Hofflander moved for partial summary judgment asserting that the "custody and control" rule set forth in *Jankee* applied to her, thereby expunging contributory negligence as a defense. After a hearing, the trial court granted the motions of the health care providers, concluding that Hofflander's conduct was not foreseeable and therefore the "custody and

---

[4] This is a point of contention between the parties. According to Hofflander, she became angry after her meeting with Shah and contemplated suicide. She then changed her mind and decided to escape. In a deposition, Hofflander testified that an hour elapsed before she implemented her plan, yet hospital records indicate only fifteen minutes or so elapsed from the end of her meeting with Shah to a phone call inquiring whether a patient was missing.

control" rule did not apply. It further determined that Hofflander's negligence exceeded the health care providers' negligence as a matter of law. Finally, the trial court determined that the safe place statute was inapplicable because Hofflander was a trespasser at the time of her escape attempt and, in addition, the statute does not encompass a person's negligent acts.

¶ 11. The review of a summary judgment motion is a question of law that we consider de novo. *Jankee*, 2000 WI 64 at ¶ 48. WISCONSIN STAT. § 802.08(2) provides that summary judgment shall be rendered when no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. We will reverse a summary judgment if a review of the record reveals that disputed material facts exist or undisputed material facts exist from which reasonable alternative inferences may be drawn. *See Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980).

### Application of the
### *Jankee "Custody and Control" Rule*

¶ 12. The pivotal issue here is whether the "custody and control" rule set forth in *Jankee* can apply to these facts, thereby eliminating Hofflander's contributory negligence as an affirmative defense. We begin our analysis with a discussion of that recent case.

¶ 13. Emil Jankee was admitted to a locked, long-term care facility on the basis of a domestic violence incident. *Jankee*, 2000 WI 64 at ¶ 17. Shortly after his admission, he decided to escape from the facility by prying open a window in his third-floor room. *Id*. at ¶ 37. He managed to squeeze out the window, but then fell from a brick ledge to the ground below. *Id*. at ¶ 39.

¶ 14. With respect to the standard of care, the supreme court adopted the general rule that an objective, reasonable person standard of care applies to a mentally disabled plaintiff.[5] *Id.* at ¶ 88. It then ruled that Jankee's contributory negligence exceeded the negligence of the health care providers as a matter of law because Jankee failed to adhere to his medication program, which triggered a foreseeable relapse of his mental illness, and he was the major cause of his own injuries. *Id.* at ¶¶ 88–89.

■■■

¶ 15. The court next considered whether the facility's custody and control of Jankee created a duty for the facility that overrode Jankee's duty to exercise ordinary care for his own safety. *Id.* at ¶ 91. Under the "custody and control" rule fashioned by the court, a mentally disabled plaintiff may expunge the affirmative defense of contributory negligence if: (1) a special relationship existed, giving rise to a heightened duty of care, and (2) the caregiver could have foreseen the

---

[5] The court in *Jankee v. Clark County*, 2000 WI 64, 235 Wis. 2d 700, 612 N.W.2d 297, recognized two exceptions to the application of the objective standard which were not applicable in that case. First, an objective standard will not apply to mentally disabled persons in institutionalized settings who do not have the capacity to control or appreciate their conduct when they cause injury to caretakers employed for financial compensation. *Id.* at ¶ 59 (citing *Gould v. Am. Family Mut. Ins. Co.*, 198 Wis. 2d 450, 543 N.W.2d 282 (1996)). Second, a person will not be found negligent when he or she is suddenly overcome without forewarning by a mental disability or disorder that makes it impossible for the person to appreciate the duty to exercise ordinary care in an ordinarily prudent manner. *Jankee*, 2000 WI 64 at ¶ 57 (citing *Breunig v. Am. Family Ins. Co.*, 45 Wis. 2d 536, 173 N.W.2d 619 (1970)). Neither of these exceptions applies to the facts before us.

particular injury that is the source of the claim. *Id.* at ¶¶ 92–93. If a special relationship existed but the caregiver could not have foreseen the injury, the affirmative defense of contributory negligence re-enters the equation. *Id.* at ¶ 93. Even if the injury was foreseeable, the defense of contributory negligence is available if the caregiver's exercise of care was not only reasonable but also fully responsive to the heightened duty with which the caregiver was charged. *Id.*

¶ 16. In applying the "custody and control" rule to the facts before it, the supreme court ruled that a special relationship exists between an involuntarily committed person and a psychiatric hospital. *Id.* at ¶ 94. The court then considered whether the hospital could have foreseen Jankee's escape attempt. The court noted that Jankee had no history of escape attempts, and had expressed no thoughts of elopement during his confinement. *Id.* at ¶ 102. Jankee's statement, "I'm tired of being used for a guinea pig around here. Why don't you kick my ass out of here instead of giving me a bunch of medication," did not alert the staff to a possible elopement. *Id.* Under these facts, the court concluded that Jankee had no cause of action because the caregiver, although it had a heightened duty towards Jankee, had no notice of his disposition toward escaping. *Id.* at ¶ 103.

¶ 17. To apply the "custody and control" rule to this case, we must determine first, if a special relationship existed and second, whether Hofflander's disposition to escape was foreseeable to the caregivers.

¶ 18. We conclude as a matter of law that there was a special relationship between St. Catherine's and Hofflander. Hofflander was admitted to the hospital as a potential WIS. STAT. ch. 51 detainee. True, the record

indicates that Shah intended to allow Hofflander to sign a voluntary admission, but this information was not conveyed to Hofflander before her attempted escape. In any event, we may surmise that if Hofflander did not choose to voluntarily admit herself, then the ch. 51 proceedings would still have gone forward. The court in *Jankee* recognized that a special relationship will usually exist in a mental commitment facility or prison because these institutions alter expectations of responsibility for safety and may deprive persons of normal opportunities for protection. *Jankee*, 2000 WI 64 at ¶ 94. Because of the involuntary nature of Hofflander's confinement, we determine that a special relationship existed between her and St. Catherine's.

■

¶ 19. Horizon argues that it did not have a special relationship with Hofflander because it was merely the manager and not the owner of the psychiatric unit. Horizon emphasizes that all of the caregivers who attended Hofflander were St. Catherine's employees. However, we view Horizon's role as manager as strengthening the conclusion that a special relationship existed between Horizon and Hofflander. Hofflander's caregivers all reported to a Horizon manager, and the manager was responsible on a day-to-day basis for monitoring the unit regarding work and safety issues. These clinical management responsibilities form the basis of a special relationship with Hofflander giving rise to a heightened duty of care.

¶ 20. The parties differ as to what is required under the foreseeability prong of the "custody and control" rule. St. Catherine's argues that contributory negligence is expunged only if the caregiver could have foreseen the *particular* injury that is the source of the claim, pointing to language in *Jankee* that "a hospital is

not an insurer of its patients against injury inflicted by themselves." *Id.* at ¶ 95 (citation omitted). St. Catherine's argues that the evidence does not show that the hospital could have foreseen that Hofflander would enter another patient's room, tear out the air conditioning unit and attempt to escape out a window using bed sheets as a rope. As St. Catherine's points out, minutes prior to the attempted elopement, Shah had concluded that suicide and elopement precautions were unnecessary. Moreover, St. Catherine's claims, there is no evidence of actual or constructive notice of the air conditioning unit requiring maintenance.

██

¶ 21. We believe that St. Catherine's reads the language of the court in *Jankee* too strictly. True, at one point in the opinion, the court said the particular injury must be foreseeable, *id.* at ¶ 93, but when the court analyzed the issue, it did not examine whether Jankee would escape in the manner he did, but rather whether he manifested the disposition to escape. "[W]e must answer the question whether [the defendant] had notice of Jankee's disposition to escape or commit suicide." *Id.* at ¶ 99. Similarly, the court concluded "there is no cause of action here because [the defendant] did not have notice about Jankee's disposition toward escaping." *Id.* at ¶ 103. This interpretation of foreseeability makes sense since the duty of a hospital is to exercise such ordinary care as the hospital knows, or should know, the patient's mental condition requires. *Id.* at ¶ 95. A hospital that has reason to anticipate a patient's escape is under a duty to take special precautions. *Id.* at ¶ 97. Therefore, we appropriately focus our inquiry on whether the facts allow for the inference that Hofflander exhibited a disposition to elope.

¶ 22. Hofflander argues that the record is replete with indications that she was an elopement risk. First, she points out that unlike Jankee, she was admitted initially as a suicide risk. Although she was removed from suicide precautions, the record indicates that throughout her stay she was uncooperative, hostile and volatile. We find the following medical notes relevant evidence of her demeanor and disposition to escape:

*December 29, 1996, 0930:* Patient had to be escorted from group room—loud and disruptive during group—patient attempting to escalate other patients.

*December 29, 1996, 1000:* Special entry: Pam Stewart . . . phoned unit—she said she fears for her safety—patient is calling her and threatening her, Pam Stewart, "She called and said, I hope you're happy! When I get out of here I'll get even!" I tried to explain chapter status to [patient], she is too angry to listen.

*December 29, 1996, 1130:* Special entry: Patient reported to have told another patient she has a plastic glove and plans to kill herself with it. I approach patient and did see the glove on the bed—she stated, "If I want to kill myself I will! I could break out of here if I want!" Continued to be loud and disruptive at times.

*December 30, 1996, 1030:* [Patient] alert, oriented, hyperverbal, loud at times . . . acknowledged that she plans to "flee" as she has 5 warrants in Illinois for DUI. . . .

*December 30, 1996, 1440:* Patient . . . went from smiling and calm to anxious and tearful in only a couple of minutes. . . . She is very concerned about the apartment she is living in, and is suppose to vacate before January 1.

■■■

¶ 23. In addition to these notations, there are the inferences to be made from the makeshift shoelaces and request for make-up just prior to the attempt, as well as

Shah's instruction that Hofflander be watched more closely because she was angry. Hofflander's expert witness provided an affidavit that these facts should have made it foreseeable that Hofflander might attempt to escape. Certainly, a jury could infer that these facts taken together would alert a reasonable person to the need for stricter supervision, even though elopement precautions had not been ordered. This would in turn raise a duty on the staff to increase the monitoring of the patient. Because Hofflander was not observed going into another patient's room just minutes after being caught with shoelaces, because Hofflander was able to singlehandedly remove the air conditioning unit from the window when it was supposed to be secure, and because the crash of the unit caused no one to come running, it is possible a jury might believe that the caregivers failed to exercise the ordinary care that the hospital knows, or should know, the patient's mental condition requires.

¶ 24. We recognize that the court in *Jankee* found as a matter of law that the caregivers in that case could not have reasonably foreseen the patient's disposition to escape. However, we believe *Jankee* recognizes that material issues of fact on the question of foreseeability could exist. *See id.* at ¶¶ 99–103 (examining factual history in light of foreseeability factor). Unlike in *Jankee*, in this case there are sufficient reasonable alternative inferences that can be drawn from the facts to require adjudication by a jury. We therefore reverse the summary judgment in favor of St. Catherine's and Horizon on the issue of Hofflander's contributory negligence and remand for trial on the threshold issue of foreseeability. We will leave the structure of the verdict to the parties and the trial court. But we note that the trial court's original determination of contributory neg-

ligence as a matter of law was made without the benefit of live testimony before the court. The court may want to rethink that and submit a question of contributory negligence to the jury or fact finder depending on how the jury or fact finder answers the foreseeability issue.

## *Safe Place*

¶ 25. As an alternative cause of action, Hofflander asserts that St. Catherine's and Horizon violated their safe place responsibilities under WIS. STAT. § 101.11(1) ("[e]very employer and every owner of a place of employment or a public building . . . shall so construct, repair or maintain such place of employment or public building as to render the same safe"). The trial court rejected application of the safe place statute because (1) wresting the air conditioner from the window, pulling it out, and exiting onto a window sill is a trespass; (2) any unsafe condition that existed in the room was due to the negligent acts of Hofflander; and (3) lack of evidence that the caregivers had notice of the condition of the air conditioner. We reverse the trial court's order of summary judgment for the reasons described below.

■■■■■■■

¶ 26. In order for Hofflander to prevail under the safe place statute, she must prove that there was an unsafe condition, that the caregivers had either actual or constructive notice of the unsafe condition, and that the unsafe condition caused her injury. *See Topp v. Cont'l Ins. Co.*, 83 Wis. 2d 780, 787, 266 N.W.2d 397 (1978). St. Catherine's and Horizon[6] argue that Hof-

---

[6] Horizon also argues that Hofflander's safe place claim does not apply to it because Horizon did not have control of the premises within the meaning of the statute. This is basically the same argument Horizon made when we discussed the *Jankee*

flander was a trespasser, either when she entered another patient's room or when she climbed onto the window sill, and therefore they had no duty to repair an unsafe condition with respect to her. The less stringent duty owed to a trespasser by an owner or employer is to refrain from willfully and intentionally injuring the trespasser. *Monsivais v. Winzenried*, 179 Wis. 2d 758, 766, 508 N.W.2d 620 (Ct. App. 1993).

¶ 27. We do not agree that a person involuntarily committed to a locked psychiatric unit can be considered a trespasser. While it may have been against hospital policy for Hofflander to enter the room of another patient, her violation of that policy would not cause her to become a trespasser in the legal sense of that term. A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." *Id.* at 765 (citation omitted). Neither St. Catherine's nor Horizon cites to any case that has applied this concept of trespass to a mentally disturbed person involuntarily committed in a potential WIS. STAT. ch. 51 proceeding. We observe that psychiatric wards are often host to patients who are uncooperative, unpredictable and unable to assume the ordinary duty of self-care and protection. They may be expected to enter areas that are forbidden and potentially hazardous. Yet, if we were to follow the reasoning of St. Catherine's and Horizon, a patient who ingested quantities of drugs

---

"custody and control" rule and we reject it for the same reasons. In particular, the record reveals that a Horizon manager had daily responsibility for monitoring the psychiatric unit, including conducting or documenting safety inspections, and "writing up the work orders, if there was work that needed to be done and sending those to maintenance and monitoring that."

from an unlocked medicine cabinet would have no safe place claim because of his or her status as a trespasser. It simply is not reasonable or sound public policy to absolve a hospital from safe place liability in such circumstances.

¶ 28. Ordinarily, a person's status as a trespasser or a frequenter is a question for the jury. *Monsivais*, 179 Wis. 2d at 764. However, in this case we are compelled to hold that Hofflander was not a trespasser, either in another patient's room or on the window sill, as a matter of law.

¶ 29. St. Catherine's and Horizon correctly note that the safe place statute applies to unsafe conditions on the premises and not to an actor's negligent acts while on the premises. Thus, in *Barth v. Downey Co.*, 71 Wis. 2d 775, 779–80, 239 N.W.2d 92 (1976), the supreme court held that a plaintiff's climbing into a ceiling-high duct after he had weakened its adjacent supports constituted an act that was unsafe rather than a condition that was unsafe. St. Catherine's and Horizon argue that the same logic applies to this case. Here, they assert, Hofflander's act of removing the air conditioning unit created the unsafe condition that led to her injuries. We do not agree that *Barth* controls the outcome of this issue.

¶ 30. We are convinced that when determining whether an unsafe condition exists on the premises, we must consider the use or purpose the premises serve. The principle of intended use has been used by courts in Michigan under a statute similar to Wisconsin's safe place statute. Hence, the supreme court of Michigan held that a jail cell, though safe for ordinary prisoners, may be defective when it is used for mental patients without being equipped with padded walls. *See Lockaby*

*v. County of Wayne*, 276 N.W.2d 1, 2–3 (Mich. 1979). Similarly, a classroom, though safe for general studies, may be defective for lacking laboratory safety equipment when that room is used as a physical science room. *See Bush v. Oscoda Area Sch.*, 275 N.W.2d 268, 273 (Mich. 1979). When we apply this approach to our case, we focus not on Hofflander's act of removing the air conditioner, but on the state of repair of the air conditioner itself. Here, there exists a question of fact for a jury to determine whether a loose air conditioning unit, located in a room used by mentally disturbed patients, was an unsafe condition and, if so, whether St. Catherine's and Horizon had constructive notice of it.

 ·

¶ 31. St. Catherine's and Horizon argue that even if the loose air conditioner was an unsafe condition, Hofflander offers no evidence of constructive notice of the condition. In fact, the record shows that the hospital's policy was to conduct environmental room checks on each shift and included in those checks would be observations regarding window units. Furthermore, the nurse responsible for the environmental check on the day of Hofflander's attempted elopement indicated that she did not check the window unit. This raises a disputed issue of fact with respect to whether St. Catherine's and Horizon should have had constructive notice of the unit's disrepair.

### *Discovery of JCAHO Surveys*

¶ 32. We now consider Hofflander's appeal of the trial court's pretrial ruling prohibiting discovery of Joint Commission on Accreditation of Healthcare Organizations (JCAHO) site surveys on the ground that these records were peer review documents under Wis.

STAT. § 146.38.[7] Hofflander asserts that information in those reports may be relevant to whether the hospital had constructive notice of environmental safety issues, including the security of the air conditioning unit. Whether JCAHO reports are discoverable is an issue of first impression in Wisconsin.

¶ 33. Generally, discovery disputes are addressed to the trial court's discretion. *Franzen v. Children's Hosp. of Wis. Inc.*, 169 Wis. 2d 366, 376, 485 N.W.2d 603 (Ct. App. 1992). We will uphold a discretionary decision if the trial court applied the relevant law to the facts of record using a process of logical reasoning. *Id.* However, in this instance, the ultimate issue is the application of WIS. STAT. § 146.38 to the undisputed facts. That exercise presents a question of law which we review de novo. *Briggs v. Farmers Ins. Exch.*, 2000 WI App 40, ¶ 14, 233 Wis. 2d 163, 607 N.W.2d 670, *review denied,* 234 Wis. 2d 178, 612 N.W.2d 734 (Wis. Apr. 26, 2000) (No. 99–1123).

¶ 34. In tandem with WIS. STAT. § 146.37, providing civil immunity to persons who conduct peer reviews, WIS. STAT. § 146.38 was "enacted to protect the confidentiality of the peer review process," and to promote frank discussion among physicians to improve the

---

[7] WISCONSIN STAT. § 146.38 states in relevant part:

(1m) No person who participates in the review or evaluation of the services of health care providers or facilities or charges for such services may disclose any information acquired in connection with such review or evaluation except as provided in sub. (3).

(2) All organizations or evaluators reviewing or evaluating the services of health care providers shall keep a record of their investigations, inquiries, proceedings and conclusions. No such record may be released to any person under s. 804.10(4) or otherwise except as provided in sub. (3). . . .

overall quality of services they provide. *State ex rel. Good Samaritan Med. Ctr.-Deaconess Hosp. Campus v. Moroney*, 123 Wis. 2d 89, 98, 365 N.W.2d 887 (Ct. App. 1985). Our task under the statute is to determine whether the JCAHO records are generated by a health care review program organized and operated to help improve the quality of health care. *Id.* at 97. In *Moroney*, we held that the determinations of a hospital's governing body, based on records and conclusions of peer review committees, were not privileged under this section because the decision of a governing body is one step removed from the actual peer review. *Id.* at 99.

¶ 35. We believe the public policy addressed in *Moroney* mandates the conclusion that the JCAHO reports are immune from discovery. We are further persuaded by the case law in other jurisdictions which has held that such documents are the equivalent of peer reviews that are not subject to discovery. In *Niven v. Siqueira*, 487 N.E.2d 937, 941 (Ill. 1985), the Illinois Supreme Court set forth the purposes of the Joint Commission and the procedures it follows:

> Its basic purposes are to establish standards for the operation of health care facilities, to conduct survey and accreditation programs that encourage and assist health care facilities in the task of promoting efficient, high quality patient care, and to recognize compliance with their standards by issuance of certificates of accreditation. The Joint Commission's standards and accreditation programs are concerned with all aspects of hospital operation.
>
> In surveying a hospital which has applied for accreditation the Joint Commission conducts an on-site survey, interviews employees, physicians, and patients of the hospital, and examines the hospital's records and files, including materials specifically protected by the

Act. The survey team's report includes recommendations for improvements. A hospital's accreditation status depends in part upon the hospital's progress in remedying identified deficiencies.

■■■

¶ 36. From the above, it is clear to us that JCAHO performs functions equivalent to a peer review committee. Further, JCAHO is an association to which local hospitals voluntarily submit for review in order to improve the quality of health care services. *Fretz v. Keltner*, 109 F.R.D. 303, 311 (D. Kan. 1985). We are in agreement with the courts in *Fretz* and *Niven* that this embraces the core of the protection offered by the statute. WISCONSIN STAT. § 146.38 is designed to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care. We also agree with St. Catherine's that allowing discovery of JCAHO reports would discourage hospitals from seeking accreditation, thereby depriving them of an impartial and objective review of the services they provide. Therefore, we affirm the trial court's ruling that § 146.38 bars discovery of the JCAHO materials.

*By the Court.*—Judgments reversed and causes remanded with directions; order affirmed; order vacated.