Lori HOFFLANDER, Plaintiff-Appellant-Cross Petitioner,

MILWAUKEE COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff-Co-Appellant,

v.

ST. CATHERINE'S HOSPITAL, INC., Sentry Insurance, a Mutual Company, Patients Compensation Fund, Horizon Mental Health Management, Inc. and Columbia Casualty Company, Defendants-Respondents-Petitioners.

Supreme Court

*No. 00–2467. Oral argument September 5, 2002.—Decided July 1, 2003.*

2003 WI 77

(Also reported in 664 N.W.2d 545.)

539

540

541

543

544

547

For the defendants-respondents-petitioners St. Catherine's Hospital, Inc., Sentry Insurance Company and Patients Compensation Fund, there were briefs by *John A. Nelson, Timothy W. Feeley* and *von Briesen, Purtell & Roper, S.C.,* Milwaukee, and oral argument by *John A. Nelson.*

For the defendants-respondents-petitioners Horizon Mental Health Management, Inc. and Columbia Casualty Company, there were briefs by *John K. Hughes* and *Gessler, Hughes, Socol, Piers, Resnick & Dym, Ltd.,* Chicago, Illinois, and oral argument by *John K. Hughes.*

For the plaintiff-appellant-cross petitioner, there were briefs by *Jerome A. Hierseman* and *Gray & End, L.L.P.,* Milwaukee and oral argument by *Jerome A. Hierseman.*

For the plaintiff-co-appellant, there was a brief by *Louis Edward Elder,* principal assistant corporation counsel.

An amicus curiae brief was filed by *Timothy J. Aiken, David M. Skoglind* and *Aiken & Scoptur, S.C.,* Milwaukee, for Wisconsin Academy of Trial Lawyers, with oral argument by *Timothy J. Aiken.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals.[1] We are asked to address multiple issues related to injuries sustained by Lori Hofflander (Hofflander) during her December 1996 stay in the Behavioral Services Unit of St. Catherine's Hospital in Kenosha.

¶ 2. Hofflander was involuntarily committed to the hospital as a suicide precaution. Two days later, she attempted to escape through a third-floor window in another patient's room, after ripping a loose air conditioner out of its window mounting. As Hofflander climbed out of the window, she lost her grip and fell to the ground, sustaining severe injuries.

¶ 3. Hofflander sued the hospital and other named defendants to recover damages for these injuries.[2] The Circuit Court for Kenosha County, Mary Kay

---

[1] *Hofflander v. St. Catherine's Hosp., Inc.*, 2001 WI App 204, 247 Wis. 2d 636, 635 N.W.2d 13.

[2] The defendants in this action are St. Catherine's Hospital and its named insurer, Sentry Insurance Company (collectively St. Catherine's), along with Horizon Mental Health Management, Inc., and its insurer, Columbia Casualty Company (collectively Horizon). Horizon is under contract with St. Catherine's to manage the Behavioral Services Unit of the hospital. The Wisconsin Patients Compensation Fund was also joined as a defendant pursuant to Wis. Stat. § 655.27(5) (1999–2000) and is liable to the extent that any damages exceed the maximum liability limits for which the defendant health care providers are insured. *See* Wis. Stat. § 655.27(1) (1999–2000).

The Milwaukee County Department of Human Services is also a party in this case as a subrogee to Hofflander, having paid a portion of her medical expenses related to the alleged negligence of the defendants. The circuit court's judgments in favor of St. Catherine's and Horizon included the taxation of costs against Milwaukee County. Milwaukee County then filed a

Wagner-Malloy, Judge, granted the defendants' motions for summary judgment on all of Hofflander's substantive claims. The court of appeals reversed on her claims of negligence and safe place violations and remanded the action for jury trial. We granted the defendants' petition for review.

¶ 4. In *Jankee v. Clark County*, 2000 WI 64, 235 Wis. 2d 700, 612 N.W.2d 297, we reaffirmed the rule that a person with mental disability has a duty to exercise ordinary care. Such a person may be found contributorily negligent for his or her own injuries when the person fails to exercise ordinary care for his or

---

motion in opposition to the taxation of costs, claiming that the presented costs relate only to defending the action against Hofflander, not defending against Milwaukee County's claim of having paid medical expenses in her case. After a hearing, the circuit court issued an order denying the motion, reasoning that the County's claim for costs is dependent upon whether the defendants were negligent and that Milwaukee County was "either in or out" of the litigation. *See Sampson v. Logue,* 184 Wis. 2d 20, 29, 515 N.W.2d 917 (Ct. App. 1994) (holding that a prevailing defendant is entitled to costs from all plaintiffs, including subrogated plaintiffs who elect not to participate at trial) (2–1 decision on whether to reach merits of this issue). Milwaukee County now appeals that order.

Because we are remanding the underlying negligence cause of action to the circuit court, it remains possible for the plaintiffs (both Hofflander *and* Milwaukee County) to prevail on their claims. Therefore, Milwaukee County is reinstated as a plaintiff-subrogee and we decline to address the merits of its position on taxable costs, as that issue is not yet ripe. In doing so, we deny the defendants' motion, which was held in abeyance pending our decision on the merits of this case, to strike the brief and appendix filed by the Milwaukee County Department of Health and Human Services.

her own safety.[3] We also recognized, however, that a health care institution takes on a heightened duty of care when it assumes custody and control of a person with a mental disability. In these circumstances, the institution may lose its affirmative defense of contributory negligence even though the mentally disabled person caused her own injury.

¶ 5. The primary issue in this case is how the "custody and control rule" of *Jankee,* as applied to specific facts, affects the defendants' affirmative defense of contributory negligence. In determining this issue, we are urged to clarify and restate the applicable principles of tort law that we attempted to articulate in *Jankee.*

¶ 6. We reach the following conclusions. First, genuine issues of material fact exist whether St. Catherine's Hospital and Horizon Mental Health Management knew or should have foreseen Lori Hofflander's risk of elopement from the hospital. The resolution of these disputed factual issues affects the respective defendants' duty of care and thus precludes the entry of summary judgment.

¶ 7. Second, if Lori Hofflander is able to establish that (1) the defendants assumed a special relationship with her that required a heightened duty of care; (2) the defendants should have known or foreseen her risk of elopement from the hospital; and (3) there is some evidence of the defendants' failure to exercise their heightened duty of care, then Hofflander's contributory negligence should be measured under a subjective duty of self-care. This subjective duty of care requires the

---

[3] Hereinafter we will use the term "her" rather than "his or her" in the interest of simplicity in a case in which the plaintiff is a woman.

trier of fact to weigh Hofflander's mental state at the time of her accident, including her capacity to appreciate her own conduct.

¶ 8. Third, Lori Hofflander's claim under Wisconsin's safe place statute is barred because her own negligent conduct, rather than a loose air conditioning unit, caused her injury. Hofflander is barred from recovery under this theory, irrespective of whether she is deemed a trespasser at the time of her injury. However, contrary to the court of appeals, we hold that a person involuntarily committed to a locked psychiatric unit may be deemed a trespasser under the traditional analysis for determining trespasser status in Wisconsin.

¶ 9. Finally, materials produced by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) while conducting site surveys of St. Catherine's Behavioral Services Unit were properly excluded from discovery based on the privilege granted under Wis. Stat. § 146.38 (1999–2000).[4]

## I. FACTUAL BACKGROUND

¶ 10. Late in the evening of Saturday, December 28, 1996, Lori Hofflander was involuntarily committed to the Behavioral Services Unit (Unit) at St. Catherine's Hospital in Kenosha, under an emergency detention.[5]

---

[4] All subsequent references to the Wisconsin Statutes are to the 1999–2000 volumes unless otherwise indicated. Although Hofflander's injuries occurred in December 1996, the statutory sections relevant to the disposition of this case have not substantively changed since that date.

[5] Chapter 51 of the Wisconsin Statutes allows for the emergency detention of someone who is reasonably believed to be mentally ill, drug dependent, or developmentally disabled, if

She was taken to the hospital after Kenosha police had been dispatched to her apartment in response to reports that Hofflander was threatening suicide. At the apartment, officers encountered Carol Underwood, Hofflander's mother, and Pam Stewart, one of Hofflander's friends, who had hurried to the apartment because Hofflander had made at least two suicide threats earlier in the evening. Both women said that they had spoken to Hofflander's former husband, who said he had received a telephone call from Hofflander saying that she would be dead in one hour. Police observed that Hofflander was uncooperative and had erratic mood swings. She was also under the influence of alcohol and Valium, which is the drug that she had told Stewart she would use to kill herself. Stewart advised police that Hofflander used cocaine and heroin; and at the hospital, a St. Catherine's security officer found some drug paraphernalia in a trash can in a bathroom used by Hofflander.

¶ 11. In written statements, Underwood and Stewart declared that Hofflander had indicated on previous occasions that she wanted to kill herself, but Underwood noted: "I never called the police before." Both women said that Hofflander desperately needed help. Stewart also explained that Hofflander had been distraught about losing custody of her children and about some recent brushes with the law, including at least one alcohol-related traffic arrest. At the hospital, Hofflander was interviewed by an adult crisis counselor who advised that Hofflander was a good candidate for emergency detention.

that person has manifested a substantial probability of harm to himself or herself or to others. *See* Wis. Stat. § 51.15(1).

¶ 12. The following day, December 29, Dr. Ligay Ilagan-Newman completed a history and physical examination of Hofflander at St. Catherine's. She diagnosed Hofflander with dysthymia[6] and borderline personality disorder. Dr. Ilagan-Newman determined that the suicide precaution initially ordered for Hofflander be discontinued. She also noted that Hofflander was anxious to leave the facility because she wanted to move promptly into a different, less expensive apartment. Hofflander was placed in Room 307B of the hospital's locked psychiatric unit, which is located on one wing of the hospital's third floor.

¶ 13. According to hospital records, Pam Stewart notified the Unit that Sunday morning about Hofflander having called and threatened her, saying: "When I get out of here I'll get even." A second entry that morning indicates that another patient reported that Hofflander claimed she had a plastic glove and planned to kill herself with it. A nurse subsequently found the glove on Hofflander's bed.[7] According to the entry, Hofflander told the nurse: "If I want to kill myself I will. I could break out of here if I want."

¶ 14. On Monday, December 30, there was an entry at 10:30 a.m., indicating that Hofflander denied suicidal ideation but acknowledged a plan "to flee as [she] has 5 warrants in Ill. for DUI, driving . . . revocation, failure to appear, etc." At 2:40 p.m., a social worker noted that "She is very concerned about the apartment she is living in, and is supposed to vacate before Jan. 1."

---

[6] "Dysthymia" is "depression; despondency or a tendency to be despondent." *Random House Unabridged Dictionary* 611 (2d ed. 1993).

[7] Hofflander later testified that she had removed the glove from a garbage container in the Unit and used it to try to strangle herself.

¶ 15. At approximately 5:15 p.m. that day, Dr. Ashokkumar Shah, Hofflander's attending psychiatrist, interviewed Hofflander after reviewing Dr. Ilagan-Newman's assessment and all patient records prepared since Hofflander's admission. Shah found Hofflander to be alert with labile affect, mildly irritable, and sarcastic. Hofflander denied having drug and alcohol problems despite a positive drug screening and statements from her family and Stewart that she had been using controlled substances. Dr. Shah determined that Hofflander did not have suicidal ideation or psychotic features. The interview reportedly concluded at about 5:40 p.m., at which time Dr. Shah went to the Unit's nurses' station and began entering a notation of his plan to decrease her Valium, continue Prozac, and allow Hofflander to sign for voluntary outpatient treatment "once stable."[8] Dr. Shah also requested that Nurse Cathy Witheril check on Hofflander to see if she was okay, because Hofflander had been irritable during the interview.

¶ 16. Following Dr. Shah's request, Witheril went to Hofflander's room and discovered her putting on her high-top shoes using laces that she had made from tearing strips of elastic edgings from her bed sheet. Witheril removed the shoes and laces. She observed that Hofflander's room looked otherwise undisturbed. Witheril claims that, upon returning to the nurses'

---

[8] The parties dispute the significance of Dr. Shah's "once stable" comment. Hofflander contends that this comment refers to her mental state at that time. However, Dr. Shah has since filed an affidavit averring that, by saying "once stable," he was referring to his assessment of Hofflander's mood, not her capacity to control and appreciate her conduct.

557

station, she reported the shoelace incident to Dr. Shah, who was still writing up his orders for Hofflander.[9]

¶ 17. Approximately five minutes later, Hofflander appeared at the station, exhibiting a calm disposition. She asked for her makeup and telephone numbers. Shah directed the nurses not to give Hofflander any glass objects in accord with the Unit's policy, and the makeup was dispensed in a medicine cup. The nurses observed Hofflander taking phone numbers from her purse and heading to the telephone lounge.

¶ 18. Sometime Sunday or Monday, a patient in the Unit told Hofflander that if she wanted to leave the hospital, there was a loose air conditioner in the window in Room 309.[10] At some point after the glove incident on Sunday, Hofflander began to contemplate escape and she eventually checked out the air conditioner in Room 309.[11] It is not clear when Hofflander first checked out Room 309. Specifically, it is not clear whether she inspected the room before or after she met with Dr. Shah.

¶ 19. The circuit court found as undisputed facts that:

> [o]nce inside the room [Hofflander] checked the air conditioner mounted in the window and found that it was loose. Thereafter, for the next 45 to 60 minutes or

---

[9] Dr. Shah has testified that he does not recall being told by Nurse Witheril about the shoelace incident.

[10] At no point did Hofflander advise any of the Unit's staff about the alleged condition of the air conditioner in Room 309. She also never told any of the staff that she intended to elope.

[11] Hofflander was told about the air conditioner no later than early afternoon Monday, because that is the time when the patient who told her about the air conditioner left the hospital for court.

so and probably longer, Ms. Hofflander began to plan the details of her escape. While doing so, she consciously made efforts to conceal her escape plans from the hospital staff. She first went to the nurses' station and asked for her makeup because she knew she was going to leave and wanted to fix her appearance. She also started some laundry in an attempt to divert the nurses' attention. Upon returning to her own room, Ms. Hofflander telephoned her friend and told her to meet her at the hospital with Ms. Hofflander's car. Because the shoelaces for her shoes had been confiscated upon her admission, she then tore the elastic edges from a fitted sheet on her bed so she could make shoelaces for her own shoes. As she was making these shoelaces, however, a nurse came into her room and took the elastic edging and the shoes.

¶ 20. Although the record supports the court's findings of events, it is difficult to reconcile the timing of some of these events. How could *all* these events have occurred after the interview with Dr. Shah, *if* the interview with Dr. Shah ended at approximately 5:40 p.m.? Did Hofflander ask for makeup and telephone numbers *before* or *after* the improvised plastic shoelaces were removed? Why does a report from the Kenosha Police Department indicate the Department's knowledge of Hofflander's fall at 5:52 p.m.?

¶ 21. In any event, Hofflander entered Room 309 sometime around 6:00 p.m. She brought bed sheets from the two beds in her room. The current resident of that room was sleeping; Hofflander assumed he was under medication. Once in the room, Hofflander decided to take the patient's overcoat to wear during her escape, since it was lighter in weight than her own coat. She then went to the window and began pulling the air conditioner towards her by its corners, splintering the

wood mounting supporting it in the window, until the air conditioner crashed to the floor.

¶ 22. Hofflander testified that she panicked immediately after the crash, believing that she might get caught. She quickly peeked out the door to observe whether anyone was coming.[12] Even though she saw no one approaching from the nurses' station, she feared that hospital staff would soon arrive to detain her. Therefore, Hofflander hastily tied together the bed sheets she had brought with her, attempting to affix one end of the sheets to the corner of the window and the other end to one of her ankles. As she attempted to exit the window and climb down, she lost her grip and fell from the third-story window. Shortly thereafter, other nurses from the hospital found Hofflander in the bushes underneath the window with a bed sheet tied around her ankle. As a result of her fall, Hofflander suffered multiple injuries, including a ruptured spleen and fractures to her ribs, pelvis, and arm.

## II. PROCEDURAL HISTORY

¶ 23. Hofflander filed suit in Kenosha County Circuit Court against St. Catherine's and Horizon, along with their respective insurers, alleging negligence and safe place statute violations. Following discovery, St. Catherine's and Horizon moved for summary judgment, asserting that Hofflander's own negligence precluded her from recovery as a matter of law and that the safe place statute was inapplicable in this case. Initially, the circuit court granted only Horizon's motion on the safe place claim. Thereafter, this court issued its ruling

[12] Hofflander testified that she saw some nurses at that station who were talking with each other but who did not otherwise seem aroused.

in *Jankee,* causing Horizon and St. Catherine's to renew their motions for summary judgment. Meanwhile, Hofflander moved for partial summary judgment, asserting that the "custody and control" rule set forth in *Jankee* applied to her, thereby expunging contributory negligence as a defense.

¶ 24. After a hearing, the circuit court granted the defendants' motions, concluding that Hofflander's particular conduct and injury were not foreseeable and, therefore, the custody and control rule did not apply. It further determined that Hofflander was not delusional or acting based on a sudden onset of mental illness and that her negligence exceeded the health care providers' negligence as a matter of law. Finally, the circuit court held that the safe place statute was inapplicable because Hofflander was a trespasser at the time of her escape attempt and, additionally, the safe place statute does not encompass a plaintiff's own negligent acts.

¶ 25. Hofflander appealed. The court of appeals reversed in part and affirmed in part, and remanded the case for trial. *Hofflander v. St. Catherine's Hosp., Inc.,* 2001 WI App 204, 247 Wis. 2d 636, 635 N.W.2d 13. The court affirmed the circuit court's pretrial order barring discovery of certain hospital records as privileged peer review documents. *Id.,* ¶ 36. However, the court of appeals ruled that both defendants had a special relationship with Hofflander under *Jankee's* custody and control rule and that issues of fact existed as to the foreseeability of Hofflander's particular injury. *Id.,* ¶ 23. As to the safe place claim, the court held that there were questions of fact for a jury whether the loose air conditioner represented an unsafe condition and whether the defendants had constructive notice of the disrepair. *Id.,* ¶¶ 30–31. The defendants petitioned this court for review of the court of appeals' decision regard-

ing the negligence and safe place claims, while Hofflander cross-petitioned for review of the discovery dispute. We granted review to each of the petitions.

## III. STANDARD OF REVIEW

¶ 26. The review of a decision to grant summary judgment is a question of law that we consider de novo. *Jankee,* 235 Wis. 2d 700, ¶ 48. Summary judgment shall be rendered when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). We will reverse a summary judgment if a review of the record reveals disputed material facts or if there are undisputed material facts from which reasonable alternative inferences may be drawn. *See Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473 (1980). Given the posture of this appeal, all facts and reasonable inferences therefrom are viewed in the light most favorable to the non-moving party. *See Kraemer Bros., Inc. v. U.S. Fire Ins. Co.,* 89 Wis. 2d 555, 567, 278 N.W.2d 857 (1979).

## IV. CUSTODY AND CONTROL

¶ 27. Hofflander's first theory of liability against St. Catherine's and Horizon is based upon common law negligence. First, Hofflander maintains that the staff on duty the night of her injury failed to act according to their duty of care by improperly supervising her. Second, Hofflander contends that the Unit's policies and procedures were either grossly insufficient at accomplishing the staff's duty of care or that Unit personnel simply did not correctly follow established policies that were otherwise adequate.

¶ 28. The parties agree that, if traditional rules of negligence apply, Hofflander's contributory negligence in bringing about her injuries exceeds the negligence of the defendants as a matter of law. As a general rule, a plaintiff in Wisconsin cannot recover damages if the plaintiff's own negligence exceeds the negligence of the party against whom relief is sought. *See* Wis. Stat. § 895.045; *Peters v. Menard, Inc.,* 224 Wis. 2d 174, 193, 589 N.W.2d 395 (1999); *Johnson v. Grzadzielewski,* 159 Wis. 2d 601, 608, 465 N.W.2d 503 (Ct. App. 1990).

¶ 29. Hofflander asserts, however, that the affirmative defense of contributory negligence is not available to the defendants because these defendants assumed her duty of self-care when she was committed to the hospital. Hofflander's argument is based upon the "custody and control" rule that we established in *Jankee.* Thus, *Jankee* serves as the foundation for our present analysis.

¶ 30. In *Jankee,* Emil Jankee was a patient involuntarily committed to the Clark County Health Care Center (CCHCC) who was placed in a locked, long-term care ward for the chronically mentally disabled, on the basis of a domestic violence incident. *Jankee,* 235 Wis. 2d 700, ¶ 17. Jankee was deemed a threat to harm others and, during the early part of his stay, he often displayed threatening and destructive behavior. *Id.,* ¶ 29. Although Jankee had a history of suicide attempts, it was determined that he was not a suicide risk during his stay, in part because of statements he made exhibiting an intent to avoid self-harm. *Id.,* ¶¶ 30–31, 100. Likewise, Jankee was never determined to be an elopement risk. *Id.,* ¶¶ 30, 102. A little more than a week after his admission to the CCHC, however, Jankee devised a plan and attempted to escape from the facility.

*Id.,* ¶¶ 35–37. Late one night, he succeeded in partially opening a window in his third-floor room by prying off a specially installed safety-stop in the window. *Id.,* ¶ 37. He then squeezed out of the window onto a roof, where he eventually fell from a brick ledge and sustained multiple injuries. *Id.,* ¶ 39.

¶ 31. We engaged in a two-step analysis to determine how Jankee's own conduct affected his ability to recover damages from CCHCC related to his fall. First, we established that, absent a few narrow exceptions,[13] the reasonable person standard of care applies to all mentally disabled plaintiffs when determining their level of contributory negligence. *Id.,* ¶ 75. Therefore, if a mentally disabled plaintiff's negligence in bringing about the plaintiff's own injury exceeds that of a defendant, a court must find that the contributory negligence bars recovery. *Id.,* ¶ 9. We determined that Jankee's own negligence exceeded that of the defendants as a matter of law because (1) his hospitalization was due to his own failure to take medication that controlled his mental disability; and (2) he failed to exercise his duty of ordinary care when he tried to escape from the CCHCC. *Id.*

¶ 32. Notwithstanding this general rule, we also held that certain entities, such as a mental health facility, owe a heightened duty of care to prevent foreseeable injuries to mentally disabled patients when they have assumed custody and control over these persons. *Id.,* ¶¶ 92, 94 (citing Restatement (Second) of Torts §§ 314A, 315, & 319 (1965)). As a result, we stated:

---

[13] The court acknowledged two exceptions to this general rule, neither of which is applicable to this case. *See Jankee v. Clark County,* 2000 WI 64, ¶¶ 57–58, 78–87, 235 Wis. 2d 700, 612 N.W.2d 297.

When such a special relationship exists, the caregiver assumes the duty to provide reasonable care of the protected person to prevent harm. This assumption of duty may absolve the protected person from the ordinary obligation of self-care, shift responsibility to the caregiver, and thereby expunge the affirmative defense of contributory negligence.

*Id.,* ¶ 92 (citation omitted).

¶ 33. We enunciated the following test for determining whether a caregiver serving a mentally disabled patient can be liable for harm predominately caused by the patient's own actions:

[A] plaintiff must show that: (1) a special relationship existed, giving rise to a heightened duty of care; and (2) the defendant caregiver could have foreseen the particular injury that is the source of the claim. If the special relationship existed but the defendant caregiver could not have foreseen the particular injury, the affirmative defense of contributory negligence reenters the equation. Even if the particular injury were foreseeable, the defense of contributory negligence should not be expunged if the defendant's exercise of care was not only reasonable but also fully responsive to the heightened duty with which the caregiver was charged.

*Id.,* ¶ 93. Part of the rationale behind this test was that "[i]f a caregiver is unaware of a patient's propensity for self-injury, the caregiver cannot assume the patient's duty of self-care." *Id.,* ¶ 97; *see also* Restatement (Second) of Torts § 314A cmt. e ("defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury").

¶ 34. After fully considering the arguments in this case, we acknowledge that the test set out in paragraph 93 of *Jankee* is unclear and needs revision. As a result, we have reexamined our premises in *Jankee* and now restate the law.

## A. Revision of Custody and Control Rule in *Jankee*

¶ 35. A person who is mentally disabled is held to the same standard of care as one who has normal mentality. An exception to this rule may exist when a mentally disabled person is under the protective custody and control of another. When a mentally disabled plaintiff relies on this exception to seek recovery for a self-caused injury, the plaintiff must establish that (1) a special relationship existed between the defendant caregiver and the plaintiff, giving rise to a heightened duty of care; and (2) the defendant caregiver knew or should have foreseen the particular risk of harm that led to the plaintiff's injury. If a special relationship existed but the defendant could *not* have foreseen the particular risk of harm, then the defendant is entitled to assert the affirmative defense of contributory negligence, and the fact finder should evaluate the comparative negligence of the parties using an objective standard of care.

¶ 36. However, if a special relationship did exist, the particular risk of harm was foreseeable, and there is some evidence that the defendant caregiver failed to exercise the duty of care that was required under these circumstances, the finder of fact should compare the defendant's negligence to the plaintiff's contributory negligence using a subjective standard to evaluate the mentally disabled plaintiff's duty of self care. In this

situation, if the mentally disabled plaintiff is able to show that she was totally unable to appreciate the risk of harm and the duty to avoid it, the plaintiff's contributory negligence should not be compared to the negligence of the defendant. It should be expunged as a matter of law.

¶ 37. Each principle in this revised statement of law requires comment.

1. Duty of Care for Mentally Disabled Persons

¶ 38. We affirm the principle that mentally disabled persons are generally held to the same reasonable person standard of care as other individuals. *Jankee,* 235 Wis. 2d 700, ¶ 54. This duty of care obligates all persons to exercise ordinary care for their own safety. *See Peters,* 224 Wis. 2d at 192 (quoting Wis JI—Civil 1007). Because a mentally disabled plaintiff normally operates under an objective standard of care, she is normally subject to the same principles of contributory negligence as a plaintiff who is not mentally disabled. *Jankee,* 235 Wis. 2d 700, ¶¶ 75–76.

¶ 39. The Wisconsin Academy of Trial Lawyers, appearing as amicus curiae, argues that *Jankee's* establishment of an objective duty of care for mentally disabled persons represents a complete reversal of prior Wisconsin law. The Academy points to the case of *Karow v. Continental Insurance Co.,* 57 Wis. 56, 15 N.W. 27 (1883), in which this court said:

> Of course, negligence involves a want of care in one who ought to bestow care. It is an omission of duty. But the law imposes no duty—no obligation of care—upon one who has no control over his mental faculties, and hence no control over his physical action. Being under no

> obligation of care, and under no restraint of duty, and incapable of exercising either, it would be inapt, if not inaccurate, to say that, by his omission, an insane person was guilty of negligence.

*Id.* at 63.

¶ 40. This passage is no longer consistent with modern negligence theory. Today, a mentally disabled person may be held liable for the damages caused by the person's "negligence" because *all* persons have a duty of ordinary care. *Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 537, 247 N.W.2d 132 (1976). The result in a typical negligence case today is the same as it would have been in 1883. Only the analysis is different.

¶ 41. Our court has never been in doubt that, as a general rule, an insane person is civilly liable for torts. In *Huchting v. Engel,* 17 Wis. 237, 238 (1863), this court quoted with approval from Reeve's Dom. Rel. 258 that "a lunatic is as liable to compensate in damages as a man in his right mind." In *Karow,* this court cited cases from four other states, including Vermont, where a court said that "no reason can be assigned why a lunatic should not be held liable." *Karow,* 57 Wis. at 61 (citing *Morse v. Crawford,* 17 Vt. 499 (1845)).

¶ 42. Contemporary analysis may be traced to *German Mutual Fire Insurance Society v. Meyer,* 218 Wis. 381, 261 N.W.211 (1935), where we held that insanity is not a defense for tort liability unless evil intent or express malice is required by the claim. *Id.* at 385. The court's opinion quoted extensively from *Karow. Id.* at 386–87. Then in *Breunig v. American Family Insurance Co.,* 45 Wis. 2d 536, 173 N.W.2d 619 (1970), the court indicated that some forms of insanity

*are* a defense and preclude liability for negligence, but not all types of insanity. *Id.* at 541. The court stated:

> The effect of the mental illness . . . or disorder must be such as to affect the person's ability to understand and appreciate the duty which rests upon him . . . [for] ordinary care, or . . . it must affect his ability to control [his conduct] in an ordinarily prudent manner. And in addition, there must be an absence of notice or forewarning to the person that he may be suddenly subject to such a type of insanity or mental illness.

*Id.* The court continued:

> We think the statement that insanity is no defense is too broad when it is applied to a negligence case where the driver is suddenly overcome without forewarning by a mental disability or disorder which incapacitates him from conforming his conduct to the standards of a reasonable man under like circumstances. *These are rare cases indeed.*

*Id.* at 543 (emphasis added).

¶ 43. The implication of the *Breunig* analysis is that the reasonable person standard of care is normally applied "even to the mentally disturbed." *Burch v. Am. Family Mut. Ins. Co.*, 198 Wis. 2d 465, 470, 543 N.W.2d 277 (1996). This was made explicit in *Gould v. American Family Mutual Insurance Co.*, 198 Wis. 2d 450, 543 N.W.2d 282 (1996), where the court said:

> It is a widely accepted rule in most American jurisdictions that mentally disabled adults are held responsible for the torts they commit regardless of their capacity to comprehend their actions; they are held to an objective reasonable person standard. *See generally,* Restatement (Second) of Torts § 283B (1965); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 135 (1984). . . .

569

> When fault-based liability replaced strict liability, American courts in common law jurisdictions identified the matter as a question of public policy and maintained the rule imposing liability on the mentally disabled. Although early case law suggested that Wisconsin followed this trend, this court specifically adopted the common law rule and the public policy justifications behind it in *German Mut. Fire Ins. Soc'y v. Meyer,* 218 Wis. 381, 385, 261 N.W. 211 (1935).

*Id.* at 456–57. The court continued:

> The court of appeals erroneously perceived the underlying premise of *Breunig* to be that a person should not be held negligent where a mental disability prevents that person from controlling his or her conduct. By limiting its holding to cases of sudden mental disability, the *Breunig* court chose not to adopt that broad premise. We also decline to do so.

*Id.* at 459 (citations omitted).

¶ 44. Consequently, the assertion that a mentally disabled person can *never* be negligent is simply wrong. As the Academy concedes, since 1971 Wisconsin has followed a pattern jury instruction, entitled "Negligence of Mentally Disturbed," that expressly states: "A person who is mentally disabled is held to the same standard of care as one who has normal mentality, and in your determination of the *question of negligence,* you will give no consideration to the defendant's mental condition." Wis JI—Civil 1021 (emphasis added). This is good law.

## 2. Custody and Control Exception

¶ 45. The custody and control rule recognized in *Jankee* is a specific exception to the general standard of ordinary care. In *Rockweit v. Senecal,* 197 Wis. 2d 409,

541 N.W.2d 742 (1995), this court recognized that " 'each individual is held, at the very least, to a standard of ordinary care in all activities.' " *Id.* at 419 (quoting *Coffey,* 74 Wis. 2d at 537). We discussed the proper analysis of duty in Wisconsin as follows: "The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." *Id.* at 419–20 (citing *A.E. Inv. Corp. v. Link Builders, Inc.,* 62 Wis. 2d 479, 483–84, 214 N.W.2d 764 (1974)). The concomitant principle is that every person in all situations has a duty to exercise ordinary care for his or her own safety. *See* Wis JI—Civil 1007.

¶ 46.　The custody and control rule is an exception to standard negligence law because it contemplates the possibility of a heightened duty of care for a defendant and a lowered duty of self-care for a plaintiff.

■

¶ 47.　Nonfeasance torts, which entail a duty to do some act of commission to prevent harm,[14] are not usually within the duty of ordinary care that people hold towards each other. *See* Restatement (Second) of Torts § 314 cmt. c; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56 (5th ed. 1984). Hence, the proposition that a defendant may be subject to a heightened duty of care must be understood as a special

---

[14]*See* Charles J. Williams, *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care,* 76 Neb. L. Rev. 301, 303–04 (1997) ("The goal of tort law is to discourage unreasonable behavior. The duty of care can encompass either the duty not to do some act that injures another (a misfeasance tort) or the duty to do some act to prevent injury to another (a nonfeasance tort).").

exception to the norm and be treated accordingly. The requirement that a defendant knew or should have foreseen a *particular* risk of harm should not be viewed as inconsistent with this court's adoption of the minority *Palsgraff* rule, *see A.E. Inv. Corp.*, 62 Wis. 2d at 483, because this requirement comes in the context of a heightened duty of care to protect against the acts of others, not an ordinary duty of care in line with general tort principles.

3. Basis of Liability

¶ 48. A special relationship exists when a defendant caregiver assumes, voluntarily or otherwise, an enhanced responsibility to protect a vulnerable, mentally disabled person from foreseeable harms. The defendant in these circumstances is empowered with custody and an extra measure of control over the person. The heightened duty of care reflects the enhanced responsibility that attends this custody and control. However, if a defendant in these circumstances were held liable for not protecting a person from *unforeseeable* harms, the defendant would effectively become an insurer.

¶ 49. A hospital is not an insurer of its patients against all injuries inflicted by themselves. *See Jankee,* 235 Wis. 2d 700, ¶ 95 (citing *Dahlberg v. Jones,* 232 Wis. 6, 11, 285 N.W. 841 (1939)). A hospital or other caregiver "is only required to use such means to restrain and guard its patients as would seem reasonably sufficient to prevent foreseeable harms." *Id.* (citing *Dahlberg,* 232 Wis. at 11). The duty of a hospital is to exercise such care as the hospital knows, or should

know, the patient's mental or physical condition requires. *Kujawski v. Arbor View Health Care Ctr.,* 139 Wis. 2d 455, 462–63, 407 N.W.2d 249 (1987). "Requiring a facility to be liable for any irrational behavior [by a patient] would impose an unreasonable burden on the [caregiver] and frustrate the objective of providing patients with a therapeutic environment free from prison-like restrictions." *Jankee,* 235 Wis. 2d 700, ¶ 101 n.37. It would force caregivers to impose stringent safety measures, not to protect patients, but to avoid liability.

4. Particular Risk of Harm

¶ 50. A mentally disabled plaintiff who seeks to rely on a defendant's heightened duty of care must establish, among other things, that "(2) the defendant caregiver knew or should have foreseen the *particular risk of harm* that led to the plaintiff's injury." *See* ¶ 35 above (emphasis added). The former test in *Jankee* required proof that "(2) the defendant caregiver could have foreseen the *particular injury* that is the source of the claim." *Jankee,* 235 Wis. 2d 700, ¶ 93 (emphasis added).

¶ 51. The foreseeability prong of the former test proved to be confusing. For example, use of the term "particular injury" led to debate whether the hospital should have foreseen Hofflander's attempt to escape from a third-floor window in another patient's room by tearing a loose air conditioner from its mounting. Did all of these elements constitute the "particular injury" that St. Catherine's and Horizon should have foreseen? Was the "particular injury" that the defendant should have foreseen even more "particular"—namely, a back injury or a leg injury as opposed to any injury?

¶ 52. The *Jankee* opinion borrowed heavily from the analysis by Charles Williams in the *Nebraska Law Review*. The wording of the foreseeability prong in the Williams article stated the proposition as follows: "For a plaintiff to prove a nonfeasance tort, the plaintiff must show that . . . (2) the harm that befell the plaintiff was of the type the defendant should have foreseen." Charles J. Williams, *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care,* 76 Neb. L. Rev. 301, 304 (1997). Our new phrase, "particular risk of harm," is more consistent with the Williams formulation than the *Jankee* language.

¶ 53. To illustrate, when a mental health institution assumes the custody and control of a mentally disabled person as a suicide precaution, the risk of suicide is clearly foreseeable. The foreseeability of suicide requires the institution to act with a heightened duty of care to prevent this particular risk of harm—at least until the risk is no longer foreseeable. Whether a particular risk of harm remains foreseeable for the entire duration of an institution's special relationship with a patient is a question of fact. However, the mere passage of time will seldom be enough for an institution to substantially relax its heightened duty of care.

¶ 54. There are other risks of harm in a mental health institution, including the risk of elopement, the risk of self-injury other than suicide, and the risk of injury to other people such as staff members, visitors, and fellow patients.[15] The custody and control rule does not signify that a caregiver is liable for any and all

---

[15] By listing these general risks of harm, we do not mean to suggest that this is an exhaustive list of harms that may be foreseeable under the custody and control rule. We note merely

injuries sustained by a patient simply because *one* risk of harm was foreseeable. Rather, our formulation is based on the proposition that the particular harm to which the mentally disabled person's claim relates should have been foreseeable.

¶ 55. In *Jankee,* we explained that modern hospitals treating persons with mental disabilities focus on therapy and rehabilitation, not maximum security. *Jankee,* 235 Wis. 2d 700, ¶ 96 (citing *Payne v. Milwaukee Sanitarium Found., Inc.,* 81 Wis. 2d 264, 270, 260 N.W.2d 386 (1977)). "A duty to restrain or guard a specific patient emerges only when a hospital has 'knowledge of the propensity or inclination of the patient to injure (himself) (herself) or escape.' Wis JI—Civil 1385.5; *see also* Wis JI—Civil 1385." *Id.*

> No cause of action arises unless the hospital has notice of an individual patient's disposition to inflict self-injury. Thus, a hospital is under no duty to take special precautions when there is no reason to anticipate one patient's escape or suicide. If a caregiver is unaware of a patient's propensity for self-injury, the caregiver cannot assume the patient's duty of self-care.

*Jankee,* 235 Wis. 2d 700, ¶ 97 (citations omitted). These passages explain our adherence to the adjective "particular" in front of the phrase "risk of harm."

¶ 56. In this case, the dispute is whether the defendants should have foreseen Hofflander's attempt to escape. Did the defendants have notice from Hofflander's statements and actions and from other available evidence of the risk that Hofflander would try

that these appear to be the most cognizable risks in the context of mental health care providers.

to elope?[16] The fact that Hofflander was initially placed as a suicide risk does not mean that she could not later manifest such a risk of elopement, thereby triggering a duty to take focused preventive action. Conversely, Hofflander's placement as a suicide risk did not automatically make every other possible risk of harm to her foreseeable as a particular risk.

¶ 57. It should be noted that the Behavioral Services Unit was a locked unit and that Hofflander did not attempt to elope from a window in her own room. These facts show the Unit's consciousness of possible patient elopement and some of the steps taken to address this risk of harm. It is a question of fact whether the defendants took sufficient steps to address this general concern. Beyond that, the question is whether the defendants should have foreseen a particular risk of elopement for Hofflander that required them to undertake additional precautions to prevent her escape.

5. Contributory Negligence—Objective Standard

¶ 58. The mentally disabled plaintiff has the burden of establishing the two elements of (1) a special relationship; and (2) the foreseeability of a particular harm. If a special relationship did not exist *or* if the defendant caregiver could not have foreseen the particular risk of harm, then the general rules of negligence apply. The defendant may assert the affirmative defense of contributory negligence, with the plaintiff's duty of self-care measured under an objective standard

---

[16] The evidence for this analysis will include information received by the hospital's staff from the attending physicians, members of the family, persons who brought the patient to the hospital, the conduct and statements of the patient while in the hospital, as well as all the circumstances under which the patient was admitted to the hospital. *See* Wis JI—Civil 1385.5.

of care. Even though the plaintiff may be mentally impaired, the defendant should not face an increased risk of liability if a special relationship did *not* exist or if the risk of harm was *not* foreseeable. The defendant's negligence, if any, should be judged by an ordinary standard of care and compared with the plaintiff's ordinary standard of self-care.

### 6. Requirement of "Some" Negligence

¶ 59. If (1) a special relationship existed between the defendant and the plaintiff; (2) the particular risk of harm *was* foreseeable; and (3) there is *some* evidence that the defendant failed to exercise the duty of care that was required under these circumstances, then the defendant may assert the defense of contributory negligence. However, under these circumstances the plaintiff's conduct should be evaluated under a subjective standard of care. This standard will permit the fact finder to weigh the plaintiff's capacity to appreciate the risk of harm and to act to avoid it.

¶ 60. In *Jankee* we said: "Even if the particular [risk of harm] were foreseeable, the defense of contributory negligence should not be expunged if the defendant's exercise of care was not only reasonable but also *fully responsive* to the heightened duty with which the caregiver was charged." *Jankee,* 235 Wis. 2d 700, ¶ 93 (emphasis added). The main thought in this inartfully worded sentence is that it takes more than having a heightened duty of care to be liable for negligence. Negligence is different from strict liability because it requires a breach of duty—a failure to satisfy whatever obligation the law imposes. In this instance, a breach of duty or want of care may not be determined solely by looking at a tragic result.

¶ 61. The phrase "fully responsive" in *Jankee* was intended to imply that *some failure* by the defendant to exercise the duty of care required because of the special relationship and the foreseeable risk of harm *is necessary* to relieve the plaintiff of her objective standard of care. There may be some attempted escapes or acts of self-destruction that are so extraordinary that the most conscientious caregiver could not have prevented them. Once again, a health care institution is not an insurer against every possible act of its patients.

7. Contributory Negligence—Subjective Standard

¶ 62. An argument can be made that once the plaintiff has established (1) a special relationship; (2) the foreseeability of a particular harm; and (3) some failure of care on the part of the defendant, the plaintiff should prevail without any further requirement. However, there will be situations in which a mentally disabled person is as able to appreciate danger as any other person and is able to control her actions. When such a person persists in pursuing dangerous and seemingly irrational conduct, the person's duty of self-care should be judged by a subjective standard and compared with the defendant's duty of care.

¶ 63. In *Jankee* the court resisted an appeal to employ a subjective standard to evaluate a mentally disabled plaintiff. We had recognized in *Gould* that mental impairments and emotional disorders come in many varieties and degrees. *Gould,* 198 Wis. 2d at 459.

As the American Law Institute recognized in its Restatement of Torts, a legitimate concern in formulating a test for mentally disabled persons in negligence cases is "[t]he difficulty of drawing any satisfactory line

between mental deficiency and those variations of temperament, intellect and emotional balance which cannot, as a practical matter, be taken into account in imposing liability for damage done." Restatement (Second) of Torts, § 283B, cmt. b.1.

*Id.* We added in *Jankee* that the administrative difficulties in employing a subjective standard include the possibility of fraudulent claims, in the sense that a mentally disabled person may try to overstate the extent of her disability, after the fact, to avoid the ramifications of her actions. *Jankee,* 235 Wis. 2d 700, ¶ 72. We also noted that a subjective standard complicates the work of the fact finder in allocating fault, for one party is to be assessed by an objective standard, while the other is to be judged by a subjective standard. *Id.,* ¶ 70.

¶ 64. Nonetheless, adherence to a strict objective standard of care for the plaintiff in the face of (1) a heightened duty of care for the defendant; (2) the foreseeability of a particular risk of harm to the plaintiff; and (3) *some* failure to satisfy the requisite standard of care on the part of the defendant, would fail to *promote* reasonable care and to *deter* negligence. We fear that an objective standard of contributory negligence in these circumstances would leave some deserving mentally disabled patients uncompensated.

8. Expungement of Contributory Negligence

¶ 65. If the mentally disabled person is able to show that she was totally unable to appreciate the risk of harm and the duty to avoid it, then the trier of fact has nothing to compare to the defendant's negligence. The plaintiff's contributory negligence should be expunged as a matter of law. This principle is consistent with our ruling in *Gould,* where we affirmed the objec-

tive standard but precluded liability, as a matter of law, for an institutionalized mentally disabled patient who attacked his professional caretaker but who did not have the capacity to control or appreciate his conduct. *Gould,* 198 Wis. 2d at 453, 463.

B. Application of Revised Test

¶ 66. Having set out and explained the elements of our modified "custody and control" rule, we now apply it to the facts at hand. We begin by acknowledging that, on the surface, the facts in this case are strikingly similar to those in *Jankee.* Both cases involve an involuntarily committed patient in a hospital's locked psychiatric unit. Both patients were injured during an attempted escape from a third-floor window of that unit. Neither Jankee nor Hofflander was injured while attempting to harm another person or to commit suicide, which were the respective risks justifying each patient's involuntary commitment. Additionally, both Hofflander and Jankee devised plans, although at varying degrees of complexity, to assist in their escape. Finally, the claims of negligence in *Jankee,* that the caregiver "inadequately policed Jankee's ward, failed to maintain close observation over him, and neglected to perform its routine, custodial duties in the course of caring for Jankee," *Jankee,* 235 Wis. 2d 700, ¶ 91, all mirror the theories of negligence advanced by Hofflander. These similarities are noted since we determined in *Jankee* that the patient's risk of elopement was not foreseeable as a matter of law. *Id.,* ¶ 103.

¶ 67. With respect to special relationship, St. Catherine's concedes that, consistent with *Jankee,* a special relationship existed between it and Hofflander, giving rise to a heightened duty of care. The mere fact

that Hofflander was slated to be switched to voluntarily admission status does not overcome the reality that she had been involuntarily placed at St. Catherine's pursuant to Chapter 51 and that she was not informed of her pending change in status. A special relationship under the custody and control rule existed between St. Catherine's and Hofflander at the time of her injuries.

¶ 68. Horizon, however, continues to assert that it never possessed a special relationship with Hofflander. The hospital contracts with Horizon to manage its psychiatric unit. In this capacity, a Horizon manager supervises the Unit's nursing therapy staff and secretaries,[17] monitors the Unit, and submits work orders if maintenance is needed. Horizon also works with the hospital to recommend and approve policies for the Unit, including policies on how patient rounds are conducted, how environmental rounds to check for unsafe conditions are conducted, and what special suicide and elopement precautions are undertaken. Since Horizon is merely the manager and not the owner or operator of the psychiatric unit, it claims that it never voluntarily takes custody or control over persons admitted to the Unit. Horizon emphasizes that all the caregivers who attended to Hofflander were St. Catherine's employees and that no Horizon employee was on duty at the time of Hofflander's attempted escape.

¶ 69. Notwithstanding these arguments, we disagree with Horizon's characterization of its relationship

---

[17] Horizon notes that it does not have supervisory or professional authority over the treating doctors on staff. Rather, these attending psychiatrists are outside private physicians with staff privileges who are employed neither by Horizon or St. Catherine's.

to patients in the Unit, including Hofflander. In acting as the manager of a psychiatric unit, Horizon necessarily assumed the same duties as the hospital that houses the unit, at least with respect to the operational responsibilities of that unit.[18] Such responsibilities are evident in the record. For example, Hofflander's caregivers all reported to a Horizon manager, who was also responsible for daily monitoring the Unit regarding work and safety issues. Merely because Horizon itself did not take Hofflander into its restrictive custody and control does not erase the fact that Horizon voluntarily assumed management of a unit that serves mentally disabled patients, like Hofflander. Therefore, we are in substantial agreement with the court of appeals that Horizon's role as manager of the Unit established a special relationship between Horizon and Hofflander, giving rise to a heightened duty of care. *See Hofflander,* 247 Wis. 2d 636, ¶ 19.

¶ 70. We now turn to the question of whether Hofflander's elopement risk was foreseeable by St. Catherine's or Horizon.[19] Although an appellate court

---

[18] We note that Horizon is not being sued based on the malpractice or other negligence of the attending medical staff in its treatment of Hofflander. Rather, Horizon's obligations of care relate to its performance in properly managing the staff and environment of the Unit, which are directly implicated in Hofflander's claims against the defendants.

[19] There is no debate as to Hofflander's purpose in exiting through that window. More pointedly, there is no factual dispute as to whether Hofflander's departure through the window in Room 309 was for the purpose of committing suicide. As Hofflander herself has testified, and to which significant competent evidence supports, suicide was not her motivation in exiting from the window. We note, however, that had

cannot make its own findings of fact, *Wurtz v. Fleischman,* 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980), this court searches the record to support the circuit court's findings of fact. *See Hamm v. Jenkins,* 67 Wis. 2d 279, 282, 227 N.W.2d 34 (1975).

¶ 71. As explained above, the primary issue in this case is whether the defendants knew or should have foreseen Hofflander's propensity to escape. Again, we begin our discussion with a recollection of *Jankee.* Emil Jankee expressed to his wife on the night of his failed escape attempt that he "wanted to get out." *Jankee,* 235 Wis. 2d 700, ¶ 34. However, there were no allegations or evidence that Jankee's wife informed anyone else, particularly the hospital staff, of Jankee's comments. The only statement made to the hospital's medical staff that might conceivably have indicated a disposition to escape was Jankee's comment on the evening of his elopement, "I'm tired of being used for a guinea pig around here. Why don't you kick my ass out of here instead of giving me a bunch of medicine." *Id.,* ¶ 34. We concluded that this "statement did not serve to alert CCHCC that Jankee would injure himself in an attempted elopement from a third floor window." *Id.,* ¶ 102. Other than this ambiguous comment, Jankee made no threats to escape while at the CCHCC. *Id.,* ¶ 101.[20]

Hofflander's injuries resulted from her exiting the window for the expressed purpose of committing suicide, or if the factual record was unclear as to her purposes for leaving, the disposition of this case may very well be different.

[20] The fact that the Clark County Health Care Center knew that different patients had previously attempted to escape through its windows, and that the Center had conducted an investigation and reconfigured the windows to make them

¶ 72. As in *Jankee,* certain material facts in this case indicate that the defendants could not have foreseen that Hofflander would attempt to escape. Dr. Shah, Hofflander's attending psychiatrist, clinically assessed her no more than 30 minutes before her escape, and he did not determine elopement precautions to be necessary. In fact, he went so far as to reduce her medication dosage and to order a change of her status from Chapter 51 involuntary to voluntary admittee as soon as she calmed down. There is no apparent evidence of Hofflander having previously attempted to escape from the Unit, of her loitering around exit doors, or of her trying to breach any door or window. In addition, the express purpose for her placement in the Unit was suicide prevention and, prior to her attempted elopement, Hofflander's psychiatrists had, on two separate occasions, determined the threat of suicide had subsided.

¶ 73. On the other hand, there is evidence that Hofflander's statements and conduct prior to and including the night of her elopement, along with other evidence in the record, reasonably implied a propensity to escape. It is true that the precautions issued for Hofflander related only to a suicide attempt. It is true that at no time during her admission was Hofflander formally deemed an elopement risk. Yet these facts alone do not disprove the foreseeability of an attempted escape. A risk to elope may develop independent of, and subsequent to, one's admission as a suicide risk, and an individual patient's proclivity to escape may be appar-

secure, *see Jankee,* 235 Wis. 2d 700, ¶¶ 23–27, only goes to the weighing of the caregiver's negligence. To wit, it is a factor to aid in weighing whether the hospital met its duty. This knowledge did not, however, affect the foreseeability of Jankee's particular elopement risk.

ent to the Unit's staff, independent of any specific diagnosis by attending psychiatrists.

¶ 74. Hofflander argues that the Unit's staff was well aware that she was an elopement risk. She points to numerous actions and statements by her suggesting that her conduct was materially different from Jankee's. For instance, hospital records indicate that on December 29th Hofflander declared that she could break out of the Unit if she wanted to. Also on the 29th, Hofflander called her friend Pam Stewart and threatened to get even with her "when I get out of here," a conversation reported in the patient notes. Furthermore, after Dr. Ilagan-Newman removed Hofflander from suicide precaution, she wrote in her report that "[t]he patient, at this time is anxious to leave the facility because she wants to relocate herself into a smaller apartment for financial reasons." Similarly, on the afternoon of the 30th, Hofflander told a nurse that she was concerned about the apartment she had been living in and that she was supposed to vacate by January 1, less than two days later. According to hospital records, Hofflander had previously acknowledged that she planned to "flee," as apparently she had outstanding criminal warrants in Illinois. Throughout her stay Hofflander was described by the medical staff as uncooperative, hostile, and volatile. This behavior, while not uncommon for involuntarily committed mentally disabled patients, may have provided clues of Hofflander's desire to leave.

¶ 75. Turning to the circumstances just prior to Hofflander's attempted elopement, there are additional facts that could reasonably support a finding of foreseeability. There is testimony that Dr. Shah expressly told Nurse Witheril to watch Hofflander closely and to check up on her. Immediately thereafter, Nurse Witheril dis-

covered Hofflander attempting to lace up her shoes using torn strips of bed sheet as laces. Hofflander asserts that all these events made it foreseeable to the staff of St. Catherine's that she might escape. *Cf. Mounds Park Hosp. v. Von Eye,* 245 F.2d 756 (8th Cir. 1957) (sustaining jury verdict that hospital was negligent in permitting patient to escape by jumping from second floor window after doctors had ordered that the patient should be observed closely).

¶ 76. Horizon's ability to foresee Hofflander's particular elopement risk may be imputed from the Unit's staff if an agency relationship existed between Horizon and St. Catherine's in which Horizon was acting as a principal. Horizon argues that its contractually based, administrative role is one of an agent, not a principal. It argues that a principal's knowledge cannot be imputed to its agent in order to hold the agent liable for negligence, unless that knowledge is communicated to the agent. *See Hunt Trust Estate v. Kiker,* 269 N.W.2d 377, 382 (N.D. 1978); *see also* Restatement (Second) of Agency § 350 cmt. b (1958). Therefore, if acting as an agent, Horizon cannot be treated as having knowledge of any of the indications of Hofflander's propensity to escape.

¶ 77. Unfortunately, the nature of the Horizon and St. Catherine's agency relationship is not entirely clear from the record.[21] Furthermore, in earlier proceedings in the circuit court, Horizon itself attempted to argue that, if there were a master-servant relation-

---

[21] As both parties concede, the issue of agency was not addressed in either the circuit court proceedings or in front of the court of appeals. Moreover, the contract between St. Catherine's and Horizon, which establishes the latter's administrative duties within the hospital's Behavioral Services Unit, is not a part of the record.

ship, it was acting as a master to St. Catherine's role as servant.[22] Therefore, in remanding this action, we instruct the finder of fact to ascertain the factual circumstances of Horizon's relationship to St. Catherine's and determine whether Horizon was acting as a principal with respect to the staff of the St. Catherine's Behavioral Services Unit.

¶ 78. We conclude that the undisputed facts in this case are sufficiently different from the facts in *Jankee* and that summary judgment in favor of the defendant caregivers is inappropriate. There are enough issues of material fact for a jury to reasonably conclude that Hofflander's elopement risk was foreseeable by the defendants.[23] We emphasize, however, that Hofflander carries the burden of proving that the particular risk of her elopement was foreseeable by the defendants.[24] We also conclude that disputed issues of material fact exist regarding the agency relationship

---

[22] If this were true, it would conclusively establish that St. Catherine's was Horizon's agent for purposes of this case. *See Arsand v. City of Franklin,* 83 Wis. 2d 40, 50, 264 N.W.2d 579 (1978) ("a servant is necessarily an agent, but an agent is not invariably a servant").

[23] We note that in support of each parties' motions for summary judgment, both Hofflander and the defendants have offered testimony from expert witnesses regarding the foreseeability of Hofflander's conduct.

[24] Foreseeability of elopement must be established by a preponderance of the evidence and may not be inferred solely from a patient's status as an involuntarily committed patient. There is no general rule that *all* mentally ill patients (even those involuntarily admitted to a psychiatric unit) should be presumed to be an escape risk as a matter of law. As testified by St. Catherine's staff, involuntarily committed patients commonly indicate a desire to leave. Furthermore, professional

between Horizon and St. Catherine's and that these issues preclude us from deciding whether Horizon is potentially subject to liability under Hofflander's claims of negligence.

¶ 79. If the trier of fact determines that Hofflander's elopement risk was foreseeable by the defendants, either directly or through imputation, then it must make the additional determination whether the defendants failed to satisfy their duty of care. Hofflander points to several indicia of negligence by the Unit's staff. First, Hofflander notes that approximately five minutes after Nurse Witheril had confiscated Hofflander's shoes and laces, she left for her dinner break. Witheril testified that, before leaving, she informed one or more of her replacement nurses of Hofflander's status, including the shoelace incident, and of Dr. Shah's request to check on Hofflander. The nurses with whom Witheril claimed she talked deny any recollection of such an order. Hofflander argues that regardless of whether Witheril failed to pass along instructions or the replacement nurses failed to heed them, the result was negligent monitoring of Hofflander. It was only a matter of minutes after this shift change that Hofflander fell from the window in Room 309.

¶ 80. Second, Hofflander points to her ability to freely enter into another patient's room, which was located relatively close to the nurses' station, and her ability to do so shortly after nurses were instructed to watch her. This was more evidence, she argues, of inadequate supervision.

---

psychiatric staff are often not moved by behavior of the type exhibited by Hofflander to issue heightened precautions, as was exhibited by Dr. Shah's responses in this case.

¶ 81. Third, Hofflander emphasizes that the air conditioner in Room 309 was permitted by the Unit's staff to fall into such a state of disrepair that a patient of Hofflander's size was able to remove it from the window without the assistance of tools or another person.[25] Then, after the air conditioner crashed to the ground, presumably producing a loud noise, none of the nurses on staff responded. Finally, she argues that the hospital staff failed to properly conduct environmental checks of the patient's rooms on the afternoon and evening of December 30, and to discover the alleged looseness of the air conditioner.

¶ 82. Based on these allegations, it is possible that a jury might determine that the defendant caregivers failed to exercise the care that the hospital knew, or should have known, the patient's mental condition required. *See Kujawski,* 139 Wis. 2d at 462–63.

¶ 83. If the defendants, either separately or collectively, are deemed at least partially negligent in failing to satisfy their heightened duty of care, then the trier of fact must also determine Hofflander's contributory negligence, as measured under a subjective duty of care. This duty of care requires the fact finder to weigh Hofflander's mental state at the time of her accident, including her capacity to appreciate her own conduct. If Hofflander did not possess a disability that rendered her utterly incapable of conforming her conduct to the standards of ordinary care, then contributory negligence can be attributed to her, taking into account

---

[25] The defendants of course aver that there is no evidence in the record that the staff knew of the alleged defective air conditioning unit or that the condition existed for a significant period of time so as to establish constructive notice.

whatever diminished capacity she may have had. *See Jankee,* 235 Wis. 2d 700, ¶ 84; *see also Champagne v. United States,* 513 N.W.2d 75 (N.D. 1994) (holding that fault comparison between health care provider and patient with diminished mental capacity should take into account the extent of patient's diminished capacity to care for his or her own safety).

¶ 84. A person's involuntary commitment under Chapter 51 does not necessarily establish that the person is so mentally disabled that she has lost her mental capacity. Not all types of insanity "vitiate responsibility for a negligent tort," *Breunig,* 45 Wis. 2d at 541, and not all types of diminished mental capacity preclude contributory negligence. Persons are placed pursuant to an emergency Chapter 51 detention if there is reason to believe that they are mentally ill and that they pose a threat of harm to themselves or others. *See* Wis. Stat. § 51.15. But, frequently, persons committed in this manner do not have their mental state comprehensively diagnosed by a medical professional until after their initial commitment. It may be that such a person's mental condition is temporary or that the person's behavior is a manifestation of other causes, including controlled substances. Furthermore, a person who is "suicidal" is not ipso facto mentally ill, much less insane. *See Karow,* 57 Wis. at 59 ("The mere fact that a man commits suicide does not even raise a presumption of insanity at the time"). If the fact finder determines that Hofflander did not suffer from any indicia of mental illness, then even under a subjective analysis she must, in effect, be held to the ordinary reasonable person standard of care. In other words, a subjective standard of care under the custody and control rule

permits evaluations of a plaintiff's mental capacity but does not presume that the plaintiff is, in fact, mentally deficient.

¶ 85. Although there is evidence in the record to indicate that Hofflander was not severely mentally ill at the time of her attempted elopement,[26] we are reluctant to rule as a matter of law that, under a subjective standard of care, her negligence exceeded that of the caregivers. Such comparisons of negligence, especially when based on determinations of subjective capacity, are well suited for a fact finder. *See Kull v. Sears, Roebuck & Co.,* 49 Wis. 2d 1, 11, 181 N.W.2d 393 (1970); *Cirillo v. City of Milwaukee,* 34 Wis. 2d 705, 716, 150 N.W.2d 460 (1967). Since there is expert testimony in the record stating that Hofflander was not competent enough to appreciate the dangerousness of her attempted escape, along with other evidence questioning her mental capacity, determination of Hofflander's negligence must be made by the trier of fact upon remand.

¶ 86. For the foregoing reasons, we affirm the court of appeals' decision to remand this action for a factual determination of whether Hofflander's injuries occurred while she engaged in a foreseeable risk of

---

[26] For example, Dr. Ilagan-Newman's history and physical report of Hofflander, conducted the day after she was admitted, states under the heading of "Mental Status Examination" that, while Hofflander projects her life's misery, "She does not present any delusions. She is not hallucinating. She presents more personality profile of one, I would say, borderline features. There is no specific suicide ideation elicited and she is orientated in all spheres." In addition, the defendant caregivers have produced expert opinions indicating that, at the time of the incident, Hofflander was not suffering from a mental illness or disease such that she could not control or appreciate her conduct in attempting to elope.

harm and whether those injuries were caused by the defendants' negligence. If both of these questions are answered in the affirmative, then the fact finder must also decide whether Hofflander's own negligence exceeded that of the defendants, applying a subjective duty of self-care to assess Hofflander's conduct.

## V. SAFE PLACE STATUTE

■

¶ 87. Hofflander also seeks relief under Wis. Stat. § 101.11,[27] Wisconsin's safe place statute. Under this statute, "owners of a place of employment or a public building have the duty to repair or maintain the premises in as safe a condition as the nature of the premises reasonably permits." *McGuire v. Stein's Gift & Garden Ctr., Inc.,* 178 Wis. 2d 379, 398, 504 N.W.2d 385 (Ct. App. 1993) (citing *Dykstra v. Arthur G. McKee & Co.,* 92 Wis. 2d 17, 26, 284 N.W.2d 692, 697 (Ct. App. 1979), *aff'd,* 100 Wis. 2d 120, 301 N.W.2d 201 (1981)). The safe place standard imposes a more stringent duty of care than the ordinary care otherwise applicable to one's conduct. *Barry v. Employers Mut. Cas. Co.,* 2001 WI 101, ¶ 18, 245 Wis. 2d 560, 630 N.W.2d 517; *Topp v.*

---

[27] Wisconsin Stat. § 101.11(1) provides:

> Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

*Cont'l Ins. Co.,* 83 Wis. 2d 780, 788, 266 N.W.2d 397 (1978). However, comparative negligence remains applicable to alleged violations of the safe place statute. *D.L. v. Huebner,* 110 Wis. 2d 581, 645, 329 N.W.2d 890 (1983) (citing *Presser v. Siesel Constr. Co.,* 19 Wis. 2d 54, 119 N.W.2d 405 (1963)). As a result, the statute does not render an owner or employer an insurer of persons on the owner's property, *McGuire,* 178 Wis. 2d at 398, nor does it create a duty that is breached simply because the premises could be made safer, *see Gross v. Denow,* 61 Wis. 2d 40, 46, 212 N.W.2d 2 (1973) (citing *Paaske v. Perfex Corp.,* 24 Wis. 2d 485, 490, 129 N.W.2d 198 (1964)).

¶ 88. The application of § 101.11 to this case raises two issues. First, did the defendants violate the safe place statute on account of the alleged loose condition of the air conditioner, or did Hofflander's own negligent conduct cause her injury? Second, was Hofflander a trespasser in Room 309, the location from which she attempted to escape, thereby diminishing the defendants' duty of care to her under the statute? We address each of these issues in turn.

¶ 89. To succeed in a claim under the safe place statute, Hofflander bears the burden of showing that (1) there was an unsafe condition associated with the structure; (2) the unsafe condition caused Hofflander's injury; and (3) the caregivers had either actual or constructive notice of the unsafe condition before Hofflander's injury. *See Topp,* 83 Wis. 2d at 787–88 (citing *Fitzgerald v. Badger State Mut. Cas. Co.,* 67 Wis. 2d 321, 326, 227 N.W.2d 444, 446 (1975)). All three elements must be proven to obtain recovery under the statute. *Id.*

¶ 90.　The court of appeals blurred this analysis by adopting a Michigan test for determining the existence of an unsafe condition and by eliminating the element of causation. *See Hofflander,* 247 Wis. 2d 636, ¶¶ 29–30. Citing two Michigan court decisions applying a Michigan statute comparable to Wis. Stat. § 101.11,[28] the court of appeals stated that "when determining whether an unsafe condition exists on the premises, we must consider the use or purpose the premises serve." *Id.,* ¶ 30 (citing *Lockaby v. County of Wayne,* 276 N.W.2d 1, 2–3 (Mich. 1979), and *Bush v. Oscoda Area Sch.,* 275 N.W.2d 268, 273 (Mich. 1979)). The court instructed the circuit court to focus not on Hofflander's act of removing the air conditioner, but on the state of repair of the air conditioner itself. *Hofflander,* 247 Wis. 2d 636, ¶ 30. Utilizing this focus, the court of appeals declared that, in this case, "there exists a question of fact for a jury to determine whether a loose air conditioning unit, *located in a room used by mentally disturbed patients,* was an unsafe condition . . . ." *Id.* (emphasis added).

¶ 91.　Wisconsin's safe place statute governs only unsafe physical conditions of premises. It does not involve reckless or negligent acts of persons on the premises. *See Stefanovich v. Iowa Nat. Mut. Ins. Co.,* 86 Wis. 2d 161, 166–71, 271 N.W.2d 867 (1978) (discussing cases applying this rule); *see also Korenak v. Curative Workshop Adult Rehabil. Ctr.,* 71 Wis. 2d 77, 84, 237

---

[28] *See* Mich. Comp. Laws § 691.1406 (2000) (applying only to public buildings owned and operated by governmental agencies).

N.W.2d 43 (1976). This "acts of operation" rule is well established in Wisconsin case law.[29]

¶ 92. The Michigan test employed by the court of appeals is not wholly inconsistent with Wisconsin law. For instance, in 1953 this court considered the sufficiency of a complaint alleging that a hospital had violated the safe place statute by failing to maintain a window and window screen in a safe condition, so that when a four-year-old patient pressed against the screen, it gave way and he fell five floors out of the window. *Wright v. St Mary's Hosp. of Franciscan Sisters, Racine,* 265 Wis. 502, 61 N.W.2d 900 (1953). We ruled that the complaint stated a cause of action, saying:

> The acts complained of in this case might not constitute negligence if the patient were a normal adult, but the duty here was to a small child. The standards of care to be complied with by the defendant are fixed by statute, which impose a duty beyond that imposed by common law.
>
> It is contended that the screen mentioned in the complaint was to keep flies and insects out and not keep patients in the hospital. That is probably true. The ultimate question in this case is whether the defendant

---

[29] Cases that have expressed and affirmed this rule include: *Leitner v. Milwaukee County,* 94 Wis. 2d 186, 195, 287 N.W.2d 803 (1980); *Korenak v. Curative Workshop Adult Rehabil. Ctr.,* 71 Wis. 2d 77, 84, 237 N.W.2d 43 (1976); *Barth v. Downey Co., Inc.,* 71 Wis. 2d 775, 779–80, 239 N.W.2d 92 (1976); *Gross v. Denow,* 61 Wis. 2d 40, 47, 212 N.W.2d 2 (1973); *Gilson v. Drees Bros.,* 19 Wis. 2d 252, 257, 120 N.W.2d 63 (1963); *L. G. Arnold, Inc. v. Indus. Comm.,* 267 Wis. 521, 525–26, 66 N.W.2d 176 (1954); *Deaton v. Unit Crane & Shovel Corp.,* 265 Wis. 349, 352–53, 61 N.W.2d 552 (1953).

should have guarded an open window in a children's ward in order to render the building safe.

*Id.* at 505–06.

¶ 93. Six years later in *Wisconsin Bridge & Iron Co. v. Industrial Commission,* 8 Wis. 2d 612, 99 N.W.2d 817 (1959), we considered a case in which a roofer fell through a hole in a roof. The hole had been created by a general contractor who put unprotected canvas over the hole. The court observed that the "safe-place statute requires the employer . . . to anticipate what the premises will be used for and to inspect them to make sure they are safe." *Id.* at 618.

¶ 94. In both of these cases, however, the unsafe condition was the sole responsibility of the employer. The injured party did nothing to create the unsafe condition. The same cannot be said here. In directing the circuit court *not* to focus on Hofflander's act of removing the air conditioner, the court of appeals disregarded the "acts of operation" rule that is a central tenet of Wisconsin safe place law. There is no doubt that an unsafe condition existed *after* the air conditioner was ripped from the window. The unsafe condition was the open window. Lori Hofflander *acted* to create the open window and *acted* to elope through the open window. A loose air conditioner did not *cause* Hofflander's injury.

¶ 95. The "intended use" or "purpose of premises" test, as defined by the court of appeals, eliminates a good part of Hofflander's required burden of proof. It eviscerates the "acts of operation" principle and wipes out causation. The only factual questions that the court of appeals stated must be determined by a jury on remand are "whether a loose air conditioning unit,

located in a room used by mentally disturbed patients, was an unsafe condition and, if so, whether St. Catherine's and Horizon had constructive notice of it." *Hofflander,* 247 Wis. 2d 636, ¶ 30. By this language, the court of appeals appeared to disallow any inquiry into Hofflander's causation of her injury. The court of appeals withdrew from the fact finder's consideration the reality that Hofflander's *acts,* not an unsafe condition associated with the structure, caused her injury. The result is strict liability,[30] a result not intended by the safe place statute.

¶ 96. The safe place statute merely affects the level of one's duty of care; it does not alter the analysis of causation.[31] "It is well established in Wisconsin that the safe-place statute does not create a cause of action. 'It merely lays down a standard of care and if those to whom it applies violate the provisions thereof they are negligent.' " *Krause v. Veterans of Foreign Wars Post No. 6498,* 9 Wis. 2d 547, 552, 101 N.W.2d 645 (1960) (quoting *Ermis v. Fed. Windows Mfg. Co.,* 7 Wis. 2d 549, 555, 97 N.W.2d 485 (1959)). Therefore, even if we were to agree that the existence of a "loose" air conditioner in a room used by mentally disturbed patients was, per se, an unsafe condition, the court of appeals' analysis was

---

[30] Strict liability operates such that a mere breach of a duty creates liability without any need to establish foreseeability and without any need to show or compare negligence. *See, e.g., Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727 (explaining how the purpose of strict liability was to alter the focus onto whether the product is unreasonably dangerous, not on the plaintiff proving the traditional elements of negligence).

[31] *See Bean v. United States,* 219 F. Supp. 8, 10 (E.D. Wis. 1963); *Ruplinger v. Theiler,* 6 Wis. 2d 493, 495, 95 N.W.2d 254 (1959).

incomplete. The issue of whether that condition caused the injuries sustained must be separately addressed.

¶ 97. When addressing this issue, the undisputed facts of this case show that the air conditioner did not cause any direct harm. This is not an instance where an air conditioner was in such a state of disrepair that, without reckless or negligent action by anyone, it fell from its mounting and caused harm. Instead there was negligent action by the plaintiff. This is what makes the case completely different from *Wright* and *Wisconsin Bridge & Iron*. But for Lori Hofflander grabbing and tearing the air conditioner out from its mounting in the window, the air conditioner was reasonably "safe," even assuming that the screws supporting the air conditioner were loose or too short.[32] Under these facts, there can be no viable claim under Wis. Stat. § 101.11.

¶ 98. In reaching its conclusion, the court of appeals rejected the defendants' reliance on *Barth v. Downey Co.,* 71 Wis. 2d 775, 239 N.W.2d 92 (1976), as controlling. *Hofflander,* 247 Wis. 2d 636, ¶ 29. In *Barth,* the plaintiff, who was an employee for a subcontractor charged with removing ceiling-high ventilation ducts, climbed into a duct after having weakened its adjacent supports. *Barth,* 71 Wis. 2d at 776–77. While the employee was in the duct, the bottom of the supported section on which he was kneeling tore apart, causing him to fall and suffer injuries. *Id.* at 777. We held that the situation constituted an *act* that was unsafe rather

---

[32] It is true that Hofflander, who weighed approximately 100 pounds at the time of the event, was able to tear out the 120–pound air conditioner. However, it was not as if she exerted no effort in removing the unit. In order for her to remove the air conditioner, she had to strenuously pull on the air conditioner, causing the wooden frame affixing the unit to the window to splinter.

than a *condition* that was unsafe, under § 101.11(1). *Id.* at 779. The court of appeals did not attempt to distinguish *Barth* from this case. It offered a different analysis based upon a different rule. However, just as the ceiling duct in *Barth* did not become unsafe until the plaintiff had weakened its support, so too the air conditioner did not constitute an unsafe condition until Hofflander removed it.

¶ 99. We need not decide, at this time, whether the "intended use" or "intended purpose" doctrine, as employed in Michigan, is ever a proper component of Wis. Stat. § 101.11(1)'s requirement that "premises [be] kept as free from danger as the nature of the place will reasonably permit." *See Gould v. Allstar Ins. Co.,* 59 Wis. 2d 355, 361, 208 N.W.2d 388 (1973).[33] The fact that the safe place statute does not cover the types of active negligence that Hofflander performed eliminates the need to definitively answer that question in the context of this case.[34]

---

[33] We note that a requirement that premises be kept as free from danger as the nature of the place will reasonably permit could conflict with contemporary notions of the desirability of creating a therapeutic atmosphere, rather than a high security atmosphere, in mental health facilities. *See Jankee,* 235 Wis. 2d 700, ¶ 71.

[34] Likewise, we need not decide the parties' competing arguments with respect to the presence of constructive notice. The defendants argue that they did not obtain any notice, constructive or otherwise, of any disrepair to the air conditioner. Hofflander asserts that this lack of notice was the result of the staff's collective failure to conduct "environmental" checks of the Unit's rooms, as required under its own policies. We concede that there are material issues of disputed fact with respect to whether St. Catherine's or Horizon had constructive notice of the air conditioner's disrepair. *Hofflander,* 247 Wis. 2d 636, ¶ 31. However, since we conclude that no unsafe *condition*

599

¶ 100. In several cases in which we determined that the safe place statute did not apply, other, more traditional negligence was likely present. *See, e.g., L. G. Arnold, Inc. v. Indus. Comm.,* 267 Wis. 521, 66 N.W.2d 176 (1954); *Deaton v. Unit Crane & Shovel Corp.,* 265 Wis. 349, 353, 61 N.W.2d 552 (1953). If the nature of a premises provides opportunities for a person to engage in negligent or intentional acts of self-destruction *and* if the party in control of that premises has a heightened duty to protect the person against that risk, then liability may result. But the liability will result from negligence under the custody and control doctrine, not negligence under the safe place statute. *Cf. Deaton,* 265 Wis. at 353 ("The safe-place statute has no application to such acts of operation, and the issue of the crane operator's negligence should have been submitted to the jury on the basis of common-law negligence."). Therefore, Hofflander's appropriate theory of liability falls within the general common law negligence domain, which merely gets Hofflander, and this court, back to where we started.

¶ 101. In sum, we hold that § 101.11 does not apply to unsafe conditions *caused by an injured party's own negligence or recklessness*—even in the setting of a locked psychiatric ward. If a structure's alleged disrepair requires reckless or negligent conduct by the plaintiff to achieve injury to herself, then the initial disrepair may not be construed as having caused the injury. Hofflander is precluded from recovering under

under the safe place statute existed independent of Hofflander's actions, our resolution of the notice issue is unnecessary to the disposition of this case.

her safe place claim as a matter of law, since her negligence—an unsafe act, not an unsafe condition—caused her injury.

¶ 102. Given our preceding holding, the defendants need not succeed on their affirmative defense of trespass in order to bar Hofflander's safe place claim. "As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues." *Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998). Nonetheless, we feel compelled to address the court of appeals' handling of this issue.

¶ 103. Property owners possess a lesser duty of care to trespassers upon their property than they do to employees, guests, or frequenters of their property. *See Prosser and Keeton on the Law of Torts* § 58 at 397. This lesser duty merely requires owners to refrain from willful, wanton, or reckless conduct directed towards the trespasser. *See Nalepinski v. Durner,* 259 Wis. 583, 586, 49 N.W.2d 601 (1951); *see also* Wis JI—Civil 8025. Since Hofflander has not alleged that the defendants willfully, wantonly, or recklessly caused her injuries, a finding that she was a trespasser while she was within Room 309, or while she was in the window of that room, would absolve the defendants from liability under the safe place statute.

¶ 104. Hofflander was not an employee of the defendants. She was not a "frequenter" *if* she was a trespasser, because trespassers are expressly excluded from the definition of "frequenter." *See* Wis. Stat.

§ 101.01(06).[35] As a result, if Hofflander were viewed as a trespasser while she was in Room 309, she would fall outside the two classes of people allowed recovery under the safe place statute.

■■

¶ 105. Under Wisconsin law, a trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." *Antoniewicz v. Reszczynski,* 70 Wis. 2d 836, 843, 236 N.W.2d 1 (1975) (adopting the Restatement (Second) of Torts § 329 definition of trespasser). Saint Catherine's and Horizon argue that Hofflander did not have expressed or implied permission to enter the room of another patient or to enter the windowsill from which she exited. As a result, they maintain that she was acting as a trespasser at the time she was injured. *See Grossenbach v. Devonshire Realty Co.,* 218 Wis. 633, 638, 261 N.W.2d 742 (1935); *McNally v. Goodenough,* 5 Wis. 2d 293, 300–01, 92 N.W.2d 890 (1958).

¶ 106. Hofflander responds, and the court of appeals agreed, that a person involuntarily placed in a locked psychiatric unit may never, as a matter of law, be considered a trespasser. *Hofflander,* 247 Wis. 2d 636, ¶¶ 27–28. The court of appeals reasoned that "psychiatric wards are often host to patients who are uncooperative, unpredictable and unable to assume the ordi-

---

[35] " 'Frequenter' means every person, other than an employee, who may go in or be in a place of employment or public building under circumstances which render such person *other than a trespasser.*" Wis. Stat. § 101.01(6) (emphasis added). Generally, the duties of an owner to a frequenter are those prescribed by the safe place act and the principles of common law negligence. *Monsivais v. Winzenried,* 179 Wis. 2d 758, 764, 508 N.W.2d 620 (Ct. App. 1993).

nary duty of self-care and protection. They may be expected to enter areas that are forbidden and potentially hazardous." *Id.,* ¶ 27.

¶ 107. We do not dispute the court's description of the general nature of psychiatric wards and the expectancies of patients' actions therein. However, we disagree that the legal effect of this characterization is to automatically eliminate Hofflander's ability to be a trespasser. The court of appeals' adoption of this bright-line rule, stating that a person involuntarily committed to a psychiatric unit can never be a trespasser within that unit, is unwarranted. Such a rule conflicts with this court's pronouncement in *Jankee,* reaffirmed today, that mentally ill persons have a duty to exercise ordinary reasonable care in their actions. It also conflicts with the criminal law.[36]

[36] Hofflander and the court of appeals make much of a hypothetical situation in which a mental patient gains access to an unlocked medicine cabinet. According to the court of appeals:

> [I]f we were to follow the reasoning of St. Catherine's and Horizon, a patient who ingested quantities of drugs from an unlocked medicine cabinet would have no safe place claim because of his or her status as a trespasser. It simply is not reasonable or sound public policy to absolve a hospital from safe place liability in such circumstances.

*Hofflander,* 247 Wis. 2d 636, ¶ 27. This statement was made in the context of rebutting the defendants' use of Hofflander's alleged trespasser status as an affirmative defense to the safe place claim. We believe that invoking this hypothetical in the context of the safe place act is misplaced. An unlocked medicine cabinet should be analyzed under common law negligence and, in the context of a case like this one, under the custody and control rule. It is clearly foreseeable in a psychiatric ward that an accessible, unlocked medicine cabinet could be invaded by

¶ 108. Wisconsin courts have previously refused to grant exceptions to the general rules of trespass based on the diminished mental capacity of the trespasser. In *Monsivais v. Winzenried,* 179 Wis. 2d 758, 508 N.W.2d 620 (Ct. App. 1993), the court of appeals decided that a tavern's patron was a trespasser when, while searching for a restroom, he entered through an unlocked basement door into the basement stairs of the tavern. *Id.* at 769. The court properly excluded from its legal calculus the fact that the injured party was severely inebriated. *Id.* at 762. Likewise, this court has recognized the general rule "that children of tender age may be trespassers even though too young to be chargeable with contributory negligence." *Baumgart v. Spierings,* 2 Wis. 2d 289, 293, 86 N.W.2d 413 (1957). Although the doctrine of attractive nuisance often obviates a young child's status as trespasser, courts nonetheless recognize that they may have this status. *See Nechodomu v. Lindstrom,* 273 Wis. 313, 327, 77 N.W.2d 707 (1956). The only valid concern when determining a plaintiff's status as a trespasser is whether, at the time of injury, the plaintiff has entered into an area of the premises that the plaintiff lacked a right, either as an employee or frequenter, to be present. Subsumed within this decision is whether such right existed by express or implied consent to enter the area. *See Reddington v. Beefeaters Tables, Inc.,* 72 Wis. 2d 119, 124, 240 N.W.2d 363 (1976).

¶ 109. Whether Hofflander was trespassing immediately before her injuries could not be decided as a matter of law at this time, as the parties continue to

one of the patients. The patient's status as a trespasser would have little effect on the caregiver's negligence.

contest whether Hofflander had an implied invitation to enter the room of another patient.[37] If such an implied invitation existed, then, at least with respect to Hofflander entering Room 309, she should be treated as a frequenter, not a trespasser. Hofflander adds that, with respect to her entry into the windowsill, it is the safe place violation itself that created the means for trespass and, therefore, the hospital cannot reasonably expect to be absolved of safe place liability when the patient trespassed into the window. At best, these are genuine issues of material fact for a jury to determine, and this principle is not to be deviated from merely because the trespass occurred within a hospital's psychiatric unit.

¶ 110. In sum, a person involuntarily committed to a locked psychiatric unit may be deemed a trespasser under the appropriate circumstances. The court of appeals erred in finding that, as a mater of law, Hofflander was not a trespasser when she was either in another patient's room or on the windowsill in that room. However, since we conclude that Hofflander's own negligent conduct caused her injury, rather than the preexisting condition of the air conditioner, Hofflander's safe place act claim is barred irrespective of whether Hofflander is properly deemed a trespasser.

## VI. DISCOVERY OF JCAHO SURVEYS

¶ 111. Because this case must be remanded to determine factual questions related to the parties' negligence, we must also address Hofflander's cross-petition for review of a discovery matter.

[37] Generally, where there is a genuine issue of fact as to whether a person had implied consent and is therefore a frequenter and not a trespasser, the resolution of that issue should be made by a jury. *See* Wis JI—Civil 1901.

¶ 112. During pretrial discovery, Hofflander sought production of the records from site surveys conducted by the Joint Commission on Hospital Accreditation of Healthcare Organizations (JCAHO) regarding St. Catherine's Behavioral Services Unit. Saint Catherine's refused to disclose these materials, asserting that the surveys were properly subject to privilege under Wis. Stat. § 146.38.[38] The circuit court agreed with St. Catherine's and denied Hofflander's motion. The court of appeals subsequently affirmed this order. *Hofflander*, 247 Wis. 2d 636, ¶ 36. Hofflander renews her arguments and petitions this court to instruct the circuit court, upon remand, to permit discovery of the JCAHO surveys that predate her injuries.

---

[38] Wisconsin Stat. § 146.38 provides in the pertinent parts:

(1m) No person who participates in the review or evaluation of the services of health care providers or facilities or charges for such services may disclose any information acquired in connection with such review or evaluation except as provided in sub. (3).

(2) All organizations or evaluators reviewing or evaluating the services of health care providers shall keep a record of their investigations, inquiries, proceedings and conclusions. No such record may be released to any person under s. 804.10(4) or otherwise except as provided in sub. (3). No such record may be used in any civil action for personal injuries against the health care provider or facility; however, information, documents or records presented during the review or evaluation may not be construed as immune from discovery under s. 804.10(4) for use in any civil action merely because they were so presented. Any person who testifies during or participates in the review or evaluation may testify in any civil action as to matters within his or her knowledge, but may not testify as to information obtained through his or her participation in the review or evaluation, nor as to any conclusion of such review or evaluation.

Wis. Stat. § 146.38. Subsection (3) of § 146.38 provides for limited circumstances in which disclosure shall occur, none of which are applicable in the present case.

¶ 113. In most instances, discovery disputes remain within the circuit court's discretion. *See Braverman v. Columbia Hosp., Inc.*, 2001 WI App 106, ¶ 11, 244 Wis. 2d 98, 629 N.W.2d 66 (citing *Franzen v. Children's Hosp. of Wis.*, 169 Wis. 2d 366, 376, 485 N.W.2d 603 (Ct. App. 1992)). Appellate courts will uphold a discretionary decision if the circuit court applied the relevant law to the facts of record while using a process of logical reasoning. *Id.* However, when a circuit court's discretionary ruling is based upon an error of law, the court has erroneously exercised its discretion. *Id.* The correct meaning of § 146.38, including its proper scope, presents a question of law, which this court reviews de novo. *See State ex rel. Badke v. Greendale Vill. Bd.*, 173 Wis. 2d 553, 569, 494 N.W.2d 408 (1993).

¶ 114. Hofflander contends that the JCAHO surveys provide information relevant to her claims[39] and that they are not properly privileged under § 146.38. According to Hofflander, the survey materials are exempt from privilege because the surveys were conducted by an outside agency that is unrelated to St. Catherine's and because the surveys were undertaken prior to the incident generating her injuries, not in response to it.

---

[39] Hofflander notes that these site surveys review conformity to a facility's policies and procedures, which she claims were not followed by the defendants and thereby contributed to her injuries. Hofflander also asserts that these materials may overcome the defendants' claim that they did not have any notice of environmental defects within the Unit. While some information within these records may be probative of Hofflander's claims, the issue disputed is one of privilege, not relevancy.

¶ 115. Hofflander's first basis for compelling disclosure, that JCAHO is not the kind of organization covered by the statute, is unsupported by the statute's plain language as well as prior case law interpreting the term "organizations" under the statute. Although there is no definition of "organization" in § 146.38, an entity constitutes an organization when it is determined to have at least some of the attributes commonly understood for that term; namely, a relatively constant membership, a body of officers, a purpose, and a set of regulations. *Franzen,* 169 Wis. 2d at 379–80. Hofflander directs this court to *State ex rel. Good Samaritan Medical Center v. Moroney,* 123 Wis. 2d 89, 365 N.W.2d 887 (Ct. App. 1985), for the proposition that decisions made by entities "one step removed" from the actual peer review process are not privileged. *Id.* at 99. *Moroney* held that conclusions by a hospital's own governing body are not privileged under § 146.38, since they were based on a peer review process independently conducted by internal review committees. *Id.* at 100.[40]

¶ 116. We conclude that JCAHO is the type of organization contemplated under Wis. Stat. § 146.38(2). In the present case, the JCAHO survey materials constitute the record of the peer review evaluation. As the court of appeals has previously stated, "that statute clearly envisions entities beyond the health care provider itself participating in the

---

[40] In particular, the disputed discovery in *Moroney* was primarily over written applications for reappointment submitted by a staff physician and over an inquiry into whether the hospital had ever limited that doctor's medical privileges, which were based on review and recommendation by a credentials committee. *State ex rel. Good Samaritan Med. Ctr. v. Moroney,* 123 Wis. 2d 89, 97–100, 365 N.W.2d 887 (Ct. App. 1985).

review and evaluation process." *Braverman*, 244 Wis. 2d 98, ¶ 31 (holding that reports generated by a Wisconsin Department of Health and Family Services review of a private hospital's quality assurance system were privileged). The type of review performed by the JCAHO for St. Catherine's is well within the ambit of § 146.38's protections.

¶ 117. Similarly, Hofflander's assertion that § 146.38 governs only reviews and evaluations of health care provider services addressing specific, prior incidents is simply unfounded. Hofflander reaches this conclusion because the review undertaken by the Department of Health and Family Services (Department) in *Braverman* happened to be in response to the hospital's specific concerns over certain infections following surgery. *Id.*, ¶ 7. However, the reactive nature of that review was not dispositive of the dispute over privilege. Rather, the court anchored its holding on a rejection of Braverman's contention that other statutes, which related to the Department's duties to publicly disseminate its investigations of diseases, essentially preempted the otherwise applicable force of § 146.38. *Id.*, ¶ 29–31. There was no dispute in *Braverman* as to the circuit court's application of *Franzen* and *Mallon v. Campbell*, 178 Wis. 2d 278, 504 N.W.2d 357 (Ct. App. 1993), to find that the Department's materials from the investigation were properly privileged under § 146.38.

¶ 118. In addition, Hofflander's attempt to employ the facts of *Braverman* to create an artificial distinction is based on a misconstruction of the language of the statute. The privilege afforded under § 146.38(2) applies to records produced from the "investigations, inquiries, proceedings and conclusions" of reviewing organizations. Wis. Stat. § 146.38(2). These

609

materials are distinguishable from information *presented* to evaluators during a review and from matters within the evaluators' own knowledge. *Franzen,* 169 Wis. 2d at 377–78.[41] These latter two sets of information, which are not privileged, are not distinguished by the *timing* of their creation, but by the *source* of their production. Hofflander seeks the JCAHO reports presented to the hospital containing the organization's conclusions from its review, not the records presented by St. Catherine's to aid the review. It is only the latter type of information that would be exempt from privilege under § 146.38(2). *Id.* at 377–78.

¶ 119. Finally, we decline to read into § 146.38 unstated limitations on the privileged nature of materials under the statute. The purpose of JCAHO reports is to enable hospitals to improve their services above the minimum levels set by the state. The reports are "the record of a health care review program organized and operated to help improve the quality of health care." *See Moroney,* 123 Wis. 2d at 97. The evaluations go to the core of why protection is afforded under the statute. "[Wisconsin] Stat. § 146.38 was 'enacted to protect the confidentiality of the peer review process,'

---

[41] *Franzen* established the framework for determining whether a party can assert privilege under § 146.38(2). First, a court must determine whether the disputed materials are (1) records of investigations, inquiries, proceedings and conclusions; (2) information, documents or records presented during the review; or (3) matters within a person's knowledge. *Franzen v. Children's Hosp. of Wis.,* 169 Wis. 2d 366, 377–78, 485 N.W.2d 603 (Ct. App. 1992). It is only the first category of materials that is privileged from discovery under § 146.38, *id.* at 378, and, therefore, circuit courts must make findings distinguishing between category (1) and categories (2) and (3). *See Braverman v. Columbia Hosp., Inc.,* 2001 WI App 106, ¶ 17, 244 Wis. 2d 98, 629 N.W.2d 66.

and to promote frank discussion among physicians to improve the overall quality of services they provide." *Hofflander*, 247 Wis. 2d 636, ¶ 34 (quoting *Moroney*, 123 Wis. 2d at 98). To permit discovery of these materials would subvert the central purpose of § 146.38 and its counterpart statute, Wis. Stat. § 146.37,[42] which is to encourage hospitals to perform quality-control reviews aimed at improving, prospectively, their services. *Moroney*, 123 Wis. 2d at 98; *see also Hofflander*, 247 Wis. 2d 636, ¶ 36 ("Wisconsin Stat. § 146.38 is designed to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care."). Limiting § 146.38's privilege to evaluations undertaken *after* a mishap and directed to that mishap would be a destructive policy not intended by the legislature.

¶ 120. For the foregoing reasons, we agree with the court of appeals that the JCAHO is an organization that performs functions equivalent to a peer review committee and that it provides information concerning how hospitals may improve their health care services. *Hofflander*, 247 Wis. 2d 636, ¶ 36. Accordingly, we concur with the court of appeals' affirmance of the

---

[42] Wisconsin Stat. § 146.37 provides civil immunity for participants involved in such review and evaluation, stating in part:

> Except as provided in s. 153.85, no person acting in good faith who participates in the review or evaluation of the services of health care providers or facilities or the charges for such services conducted in connection with any program organized and operated to help improve the quality of health care . . . is liable for any civil damages as a result of any act or omission by such person in the course of such review or evaluation.

Wis. Stat. § 146.37(1g).

circuit court's ruling that the JCAHO materials are immune from disclosure to Hofflander, pursuant to § 146.38.

## VII. CONCLUSION

¶ 121. We hold that genuine issues of material fact exist regarding whether the defendants knew or should have foreseen Hofflander's risk of elopement from the hospital. We also hold that, if this risk was foreseeable and some evidence of negligence by the defendants existed with respect to their duty to protect against that risk, then any contributory negligence on behalf of Hofflander must be measured under a subjective duty of self-care.

¶ 122. We also hold that Hofflander is barred from recovering under her safe place claim because her own negligence created the unsafe condition in Room 309. The premises itself was not unsafe under the safe place statute. In addition, we expressly reject the proposition that a person involuntarily committed to a locked psychiatric unit may never be considered a trespasser anywhere within that unit. Finally, we conclude that the JCAHO site surveys conducted for St. Catherine's are privileged, undiscoverable materials under Wis. Stat. § 146.38.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part, and the cause is remanded to the circuit court for proceedings consistent with this opinion.

¶ 123. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I agree with the majority opinion that the cause must be remanded to the circuit court. I also agree with much of the majority opinion's analysis

about a defendant caregiver's standard of care when it has custody and control over another person.

¶ 124. I write separately to make three points. First, I believe it is a mischaracterization to describe a defendant caregiver's standard of care in situations of custody and control as a heightened duty. The duty is simply to exercise ordinary (reasonable) care under the circumstances. Second, and most importantly, I disagree with the majority opinion's conclusion that a plaintiff under a defendant caregiver's custody and control can be contributorily negligent when the risk of harm is foreseeable. Third, I urge this court to adopt the rule accepted in many jurisdictions and extend the subjective standard to all other cases in which a defense of contributory negligence is raised against a mentally ill plaintiff.

## I. STANDARD OF CARE FOR CAREGIVER WITH CUSTODY AND CONTROL

¶ 125. The majority opinion concludes that a defendant caregiver with custody and control over a plaintiff will be liable for a plaintiff's self-inflicted injuries if the plaintiff can show: (1) a special relationship existed between the parties amounting to custody and control; (2) the particular risk of harm was foreseeable; and (3) there was some failure of care on the part of the defendant.[1] Adhering to *Jankee,* the majority opinion states that this custody and control rule is an exception to standard negligence law because it contemplates the possibility of a heightened duty of care for a defendant.[2] I would not state the standard of care in this way.

---

[1] Majority op., ¶ 62.

[2] Majority op., ¶ 46.

¶ 126. I conclude that the rule in Wisconsin is that there is one standard of care, and the standard of care in each case is to exercise ordinary care under the circumstances.[3] Thus, a defendant caregiver who has assumed responsibility for a mentally disabled person and knows or should know the proclivities and capacities of that person must exercise ordinary care to prevent foreseeable harm (or a particular risk of harm, as the majority opinion states).[4] As the court stated in *Kujawski v. Arbor View Health Care Ctr.,* 139 Wis. 2d 455, 462–63, 407 N.W.2d 249 (1987): "The general rule in Wisconsin is that a hospital must exercise such ordinary care as the mental and physical condition of its patients, known or should have been known, may require."[5] This standard includes ordinary care to pre-

---

[3] *Osborne v. Montgomery,* 203 Wis. 223, 233, 234 N.W. 372 (1931). The court stated in that case:

> From a multitude of cases and a long consideration of this entire field, courts have arrived at the conclusion that in the absence of a standard declared by statute or previous decision, before liability can be predicated upon the acts of the defendant, it must appear that he has failed to exercise that degree of care which the great mass of mankind exercises under the same or similar circumstances, which is usually designated "ordinary care."

*See also* Wis JI—Civil 1005 ("A person is negligent when (he)(she) fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances.").

[4] Majority op., ¶ 50–54.

[5] *See also Cramer v. Theda Clark Mem. Hosp.,* 45 Wis. 2d 147, 149, 172 N.W.2d 427 (1969); *Dahlberg v. Jones,* 232 Wis. 6, 11, 285 N.W.2d 841 (1939); *Boles v. Milwaukee County,* 150 Wis. 2d 801, 808, 443 N.W.2d 679 (Ct. App. 1989); *see also* Wis JI—Civil 1385.5 ("Negligence: Hospital: Duty of Employees: Suicide or Injury Resulting from Escape or Attempted Suicide")

vent the patient from harming herself by her own acts or in escaping if the risk of harm is foreseeable.[6]

¶ 127. For example, a defendant caregiver who knows or should know that the protected person is suicidal or will try to escape must exercise ordinary care to prevent the foreseeable harm resulting from suicide or escape. If the caregiver exercises ordinary care under these circumstances (ordinarily a question of fact), the caregiver is not negligent.[7]

## II. CONTRIBUTORY (COMPARATIVE) NEGLIGENCE OF THE PROTECTED PERSON

¶ 128. The majority opinion also concludes that a defendant-caregiver found liable under its three-part test may assert the affirmative defense of the plaintiff's contributory negligence.[8] That is, the majority opinion compares the negligence of the protected person (a subjective test to determine whether the standard of ordinary care for one's own protection was breached) with the negligence of the caregiver (an objective test to determine whether the caregiver breached its standard of ordinary care under part I above).[9] I disagree with this conclusion.

---

("Reasonable care is that care which a person of ordinary intelligence and prudence would provide under the same or similar circumstances considering the patient's physical and mental condition.").

[6] *See Klein v. BIA Hotel Corp.,* 49 Cal. Rptr. 2d 60, 64 (Ct. App. 1996); *see also Tomfohr v. Mayo Found.,* 450 N.W.2d 121, 124 (Minn. 1990).

[7] Majority op., ¶ 60.

[8] Majority op., ¶ 36.

[9] The majority opinion states:

1[T]here will be situations in which a mentally disabled person is as able to appreciate danger as any other person and is able to

¶ 129. I believe that contributory negligence is not attributable to the protected person under these circumstances. Rather, I conclude, as did the *Jankee* majority and dissenting opinions, that the caregiver's responsibility to exercise ordinary care for a foreseeable risk of harm "may absolve the protected person from the ordinary obligation of self-care, shift responsibility to the caregiver, and thereby expunge the affirmative duty of contributory negligence."[10]

¶ 130. Professor Charles F. Williams, in his article *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care,* 76 Neb. L. Rev. 301, 315 (1997), (upon which the majorities here and in *Jankee* rely), explains that when a caregiver has assumed custody and control of a protected person and knows (or should know) of the risk of harm to that protected person (*e.g.,* suicide), the caregiver has assumed the protected person's duty of self-care. The reasonableness of the protected person's conduct in causing the foreseeable harm, whether measured by a subjective or objective standard, is therefore irrelevant and has no effect on the defendant's negligence.[11]

control her actions. When such a person persists in pursuing dangerous and seemingly irrational conduct, the person's duty of self-care should be judged on a subjective standard and compared with the defendant's duty of care.

Majority op., ¶ 62.

[10] *Jankee v. Clark County,* 2000 WI 64, ¶ 92, 235 Wis. 2d 700, 612 N.W.2d 297; *see also* Wis JI—Civil 1385.5 Comment; Wis JI—Civil 1021 ("Negligence of Mentally Disabled") Comment ("Duty of Caregiver") (quoting this language and citing *Jankee*).

[11] Charles F. Williams, *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care,* 76 Neb. L. Rev. 301, 313, 318 (1997) (plaintiff's contributory

Contributory negligence, according to Professor Williams, is no defense for the caregiver. I agree.

¶ 131. Courts in other jurisdictions have similarly concluded that a protected person's "contributory negligence" plays no role under the described circumstances. The Minnesota Supreme Court, for example, has explained that comparative fault is duplicative when the fact finder is asked to determine whether the harm incurred was reasonably foreseeable by the caregiver.[12] Or to put it another way, if the caregiver breaches the standard of care, it means the risk of harm is foreseeable and the fact that the protected person might have contributed to the injury through negligence or even intentional conduct does not change the caregiver's negligence.

¶ 132. Moreover, this approach is in keeping with our previous cases recognizing that a patient's duty to exercise ordinary care in a patient-doctor relationship is extremely limited. "[T]he very patient-doctor relation assumes trust and confidence on the part of the patient and would require an unusual set of facts to render a

negligence is irrelevant); *see also* Susan O'Neal, *Contributory Negligence in Medical Malpractice: Recent Application in the Context of Suicidal Patient,* 69 Miss. L.J. 925, 941 (1999); Daniel W. Berglund, Note, *Torts: Taking the "I" Out of Suicide: The Minnesota Supreme Court's Alarming Extension of Duty in "Exceptional Relationships"—Sandborg v. Blue Earth County,* 28 Wm. Mitchell L. Rev. 1307, 1318–19, 1322 (2002).

For cases applying this reasoning, *see, e.g., Winger v. Franciscan Med. Ctr.,* 701 N.E.2d 813, 818–20 (Ill. Ct. App. 1998); *Tomfohr,* 450 N.W.2d at 125; *Cowan v. Doering,* 545 A.2d 159, 167 (N.J. 1988); *Hunt v. King County,* 481 P.2d 593, 598 (Wash. Ct. App. 1971).

[12] *Sandborg v. Blue Earth County,* 615 N.W.2d 61, 65 (Minn. 2000); *Tomfohr,* 450 N.W.2d at 125.

patient guilty of contributory negligence when the patient relies on the doctor."[13]

¶ 133. The majority opinion does not adequately explain why it is departing from *Jankee,* from Professor Williams, and from case law. Professor Williams describes the majority's approach as confused.[14] I do too.

## III. SUBJECTIVE STANDARD OF CONTRIBUTORY NEGLIGENCE IN OTHER CIRCUMSTANCES

¶ 134. I agree with the majority opinion that when the risk of harm in a case in which a caregiver has custody and control over a protected person is not foreseeable under the circumstances, the caregiver who has custody and control owes a protected person the same duty of care that it owes to any and all people.[15] Under these circumstances, the affirmative defense of contributory negligence reenters the equation.[16]

¶ 135. I disagree with the majority opinion, however, when it concludes that the protected person's contributory negligence should, under these circumstances, be measured by an objective standard.[17] I

---

[13] *Brown v. Dibbel,* 227 Wis. 2d 28, 48–49, 595 N.W.2d 358 (1999).

In cases in which the patient is negligent after the doctor's negligent treatment was administered, the later negligence is not contributory negligence that bars the action but goes to mitigation of damages. *Schulz v. Tasche,* 166 Wis. 561, 564–65, 165 N.W. 292 (1917).

[14] Williams, *supra* note 11, at 307 (permitting defense of contributory negligence in cases of custody and control does not deter unreasonable conduct, which is the goal of tort law).

[15] Majority op., ¶¶ 48, 49, 55–57.

[16] Majority op., ¶¶ 31, 65.

[17] Majority op., ¶ 35.

would follow the majority trend under these circumstances (as I did in my *Jankee* dissent) and measure the protected person's contributory negligence by a subjective standard.[18]

¶ 136. For the reasons set forth, I agree with remanding the cause to the circuit court but disagree with the majority opinion's approach to the "negligence" of the protected person.

¶ 137. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.

---

[18] *Jankee*, 235 Wis. 2d 700 ¶¶ 116–17 (Abrahamson, C.J., dissenting); Williams, *supra* note 11, at 315.